CONSUMERS UNION OF
UNITED STATES, INC.

v.

PERIODICAL CORRESPONDENTS'
ASSOCIATION, an unincorporated
association et al., Appellants.

No. 73–2253.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 6, 1975.

Decided July 21, 1975.

Neil H. Koslowe, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., New York City, Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on the brief for appellants. Peter R. Reilly, Asst. U. S. Atty., also entered an appearance for appellants.

Peter H. Schuck, Washington, D. C., with whom Carol A. Cowgill, Washington, D. C., and Marvin M. Karpatkin, New York City, were on the brief for appellee.

Before MacKINNON and ROBB, Circuit Judges, and CHRISTENSEN,[*] Senior District Judge for the District of Utah.

Opinion for the Court filed by Senior District Judge CHRISTENSEN.

CHRISTENSEN, Senior District Judge:

This is an appeal from a declaratory judgment by which the district court held that refusal of the Executive Committee of the Periodical Correspondents' Association (Association), one of the appellants herein, to accredit appellee's *Consumer Reports* and its designated representative to the Periodical Press Galleries of the Congress of the United States was a denial of equal protection and due process, and that a portion of Rule Two of the congressional rules governing such galleries violated the freedom of the press guarantee of the First Amendment to the Constitution of the United States. Consumers Union of United States, Inc. v. Periodical Corresp. Ass'n, 365 F.Supp. 18 (D.C.D.C.1973).

The appellant Association is an unincorporated membership association composed of all periodical correspondents accredited for membership in the Periodical Press Galleries of the Congress, and the other appellants, William H. Wannall and Kenneth R. Harding, are Sergeants-at-Arms of the Senate and House of Representatives, respectively. The district court's judgment is challenged by them here because of its failure to recognize that the case was not justiciable, and upon the contention, in any event, that denial of accreditation was constitutional, reasonable and in accordance with valid internal rules of the Congress.

Consumers Union of United States, Inc. (Consumers Union) is a reputable non-profit membership organization established in 1936 to foster the interests of consumers and to provide them with information and counsel on consumer goods and services. The organization derives a substantial portion of its income from the sale of its publications, primarily its monthly magazine, *Consumer Reports,* and the bulk of its income is expended in the production of these publications. *Consumer Reports,* with a circulation of 2.2 million readers, accepts no advertising nor does it accept product samples for testing and evaluation, but it includes reports of independent product evaluations conducted at its laboratory facilities, together with news items and news analyses of general interest to consumers. At the trial the government did not contend that it was a "lobbying group",[1] among the connections along with advocacy barring admission to the galleries under the Association's interpretation[2] of the Rules Governing Peri-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Counsel for the defendants at the trial:

 "[T]he distinction is, as we draw it, Your Honor, that even were the correspondents or the individuals themselves prohibited from lobbying—and we do not contend that Consumers Union or Consumers Report [sic] is a lobbying group—it certainly is not registered and I don't believe it would fall under the restrictions of Title 2 of the United States Code, but the publishers themselves in other instances, Your Honor, the distinction we would draw would be that their business is strictly publishing for profit, to operate a magazine, in other words, and disseminate the news, whereas advocacy groups such as Consumers Union— very commendably we believe—does advocate certain interests and would rather than report news would, under the guise of reporting news, be advocating the interests that they represent.

2. In a letter dated June 6, 1973, Donald E. Smith, Chairman, Executive Committee of Correspondents explained to The Honorable Howard W. Cannon, Chairman, Committee on Rules and Administration of the United States Senate, the Executive Committee's interpretation of the Rules Governing the Galleries stating: ". . . that only newsmen with no connections to any lobbying or advocacy group can properly be admitted to the galleries, for the protection of both members of Congress and disinterested organizations which publish periodicals."

odical Press Galleries, *infra,* 169 U.S. App.D.C. pp. ——–——, 515 F.2d pp. 1344–1345. However, there seems little question but that Consumers Union is a group committed to the advocacy of consumers' interests,[3] and that its *Consumer Reports* was not "published for profit and supported chiefly by advertising or by subscription, and owned and operated independently of any industry, business, association, or institution", requirements for accreditation set out in Rule 2, *infra,* and relied upon by the Association in denying appellee's application.[4]

Art. I, § 5, cl. 2 of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings . . . ." Under this broad grant of authority each House has exercised power to extend to those members of the press determined eligible, and otherwise to deny, admission to the floors and galleries of Congress.

When Congress first convened in 1789, "the Legislative as well as Executive sittings of the Senate were held *with closed doors*" (1 Annals of Cong. 16 (1789)), but the House of Representatives admitted the press to the floor so they might report the debates of the House (1 Annals of Cong. 952–56 (1789)). In 1794, the Senate authorized limited access to its galleries by the public and in 1802 resolved that "any stenographer *or notetaker,* desirous to take the debates of the Senate on Legislative business, may be admitted for that purpose at such place, within the area of the Senate Chamber, as the President shall allot." (11 [7th Congress] Annals of Cong. 22 (1802 [1801–1802]) ). For a time thereafter, reporters were permitted on the floors of the Senate and House. This privilege apparently was abused with considerable frequency by journalists importuning Members on behalf of various claims before Congress. (Cong.Globe, 32d Cong., 2d Sess. 52 (1852)). For that reason and the growing congestion on the floors, both Houses finally enacted rules permanently removing the press from the floors of Congress. Press galleries above the floors were eventually established and in 1888 the Senate (Cong.Directory, 50th Cong., 1st Sess. 160 (1888)), and 1916 the House (53 Cong.Rec. 1214 (1916)), entrusted their management to a Standing Committee of Correspondents.

Regulations governing the management of the galleries, now separated into the Press Galleries, Radio and Television Correspondents' Galleries, Periodical Press Galleries, and Press Photographers'

**3.** The charter of Consumers Union states that its purposes are to provide consumers with information and counsel on consumer goods and services, to give information on all matters relating to the expenditure of the family income, and to initiate and to cooperate with individuals and group efforts seeking to create and maintain decent living standards. Affidavit of Mr. Colston E. Warne, President of Consumers Union of United States, Inc.: "Consumers Union occasionally responds to invitations from Congressional committees to present its views on consumer issues. When Consumers Union takes positions on public issues, it does so on behalf of consumers generally and/or on behalf of its members in their roles as consumers.

" . . . Consumers Union occasionally presents its views on consumer issues to Federal administrative agencies on behalf of consumers generally and/or on behalf of its members in their roles as consumers, but has never pressed 'claims' or sought to promote any narrow organizational interest of Consumers Union. For example, Consumers Union has petitioned the Food and Drug Administration concerning labeling requirements for food products, and frequently submits comments on proposed agency rules where public comment has been solicited."

**4.** Initial notification of the decision was accompanied by a form stating that the reason for the rejection was that *Consumer Reports* was "[n]ot an independent publication" as required by rule 2. Shortly thereafter this reason was elaborated upon in a letter to the appellee from the Chairman of the Executive Committee of the Association:

"The Executive Committee which rejected the application did so under the rules that are laid down by the Senate and by the Speaker of the House. Under the existing rules, we simply are unable to accredit Consumers' Reports.

"Under section 2 of the rules, no publication shall be accredited unless it is 'owned and operated independently of any industry, business, association or institution.' It is apparent that Consumers' Reports is disqualified under this rule."

Gallery, are promulgated by Congress, which retains the right of final approval of applications for admission to the galleries. The House and Senate Periodical Press Galleries are governed by identical rules published in the Congressional Directory and signed by the Speaker of the House of Representatives and by the Chairman of the Senate Committee on Rules and Administration.

Rule XXXIV, ¶ 2 of the Standing Rules of the Senate,[5] and Rule XXXIV, ¶ 2 of the Rules of the House of Representatives,[6] *authorize the adoption of rules governing the press galleries.* For this purpose the Senate Committee on Rules and Administration adopted Rules for Regulation of Senate Wing, Periodical Press Gallery, published in the Senate Manual, 93d Cong., 1st Sess., 1973, pp. 125–27, similar rules being jointly adopted by the House and Senate and published in the Congressional Directory, 93d Cong., 1st Sess., 1973, pp. 916–17. Slight variations between the rules as published in the Senate Manual and the Congressional Directory are not deemed material to our decision. The pertinent portions of the Rules Governing Periodical Press Galleries as jointly published in the Congressional Directory are as follows:

"1. Persons desiring admission to the Periodical Press Galleries of Congress shall make application to the Speaker, as required by rule XXXIV of the House of Representatives, and to the Committee on Rules and Administration of the Senate, as required by rule VI for the regulation of the Senate wing of the Capitol; and shall state in writing the names of all newspapers or publications or news associations by which they are employed, and what other occupation or employment they may have, if any; and they shall further declare that they are not engaged in the prosecution of claims pending before Congress or the departments, and will not become so engaged while allowed admission to the galleries; that they are not employed in any legislative or executive department of the Government, or by any foreign government or any representatives thereof; and that they are not employed, directly or indirectly, by any stock exchange, board of trade, or other organization, or member thereof, or brokerage house or broker, engaged in the buying and selling of any security or commodity, or by any person or corporation having legislation before Congress, and will not become so engaged while retaining membership in the galleries. . . ."

"2. The applications required by rule 1 shall be authenticated in a manner that shall be satisfactory to the executive committee of the Periodical Correspondents' *Gallery* who shall see that the occupation of the galleries is confined to bona fide and accredited resident correspondents, *newsgatherers,* or reporters of reputable standing who represent one or more periodicals which regularly publish a substantial volume of news material of either gen-

5. "They [the Committee on Rules and Administration] shall make such regulations respecting the reporters' galleries of the Senate, together with the adjoining rooms and facilities, as will confine their occupancy and use to bona fide reporters for daily newspapers and periodicals, to bona fide reporters of news or press associations requiring telegraph service to their membership, and to bona fide reporters for daily news dissemination through radio, wire, wireless, and similar media of transmission. These regulations shall so provide for the use of such space and facilities as fairly to distribute their use to all such media of news dissemination." Rule VI of the Rules for Regulation of Senate Wing is the result of this directive and, as relates to the Periodical Press Galleries, tracks the "Rules Governing Periodical Press Galleries".

6. "Such portion of the gallery over the Speaker's chair as may be necessary to accommodate representatives of the press wishing to report debates and proceedings shall be set aside for their use, and reputable reporters and correspondents shall be admitted thereto under such regulations as the Speaker may from time to time prescribe; and the supervision of such gallery, including the designation of its employees, shall be vested in the standing committee of correspondents, subject to the direction and control of the Speaker. . . ."

eral or of an economic, industrial, technical, or trade character, published for profit and supported chiefly by advertising, and owned, and operated independently of any industry, business, association, or institution; and it shall be the duty of the executive committee at their discretion to report violation of the privileges of the galleries to the Speaker, or to the Senate Committee on Rules and Administration, and pending action thereon the offending correspondent may be suspended.

. . . . .

"5. The Periodical Press Galleries shall be under the control of an executive committee elected by members of the Periodical Correspondents' Association, subject to the approval and supervision of the Speaker of the House of Representatives and the Senate Committee on Rules and Administration."

Appellant Periodical Correspondents' Association, alluded to in the above rules, was created to administer the Periodical Press Galleries. It consists of employees of publications which have been accredited to the Periodical Press Galleries by the Association's Executive Committee. The duties of the Executive Committee, an elected body of seven members, are to accredit applicant publications and to issue credentials to members.[7] The final authority on applications for membership is lodged in the Speaker of the House of Representatives and the Senate Committee on Rules and Administration. The Sergeant at Arms of the United States Senate is charged under Rule I of the Rules for Regulation of the Senate Wing of the United States Capitol with "enforcement of all rules made by the Committee on Rules and

Administration for the regulation of the Senate wing of the Capitol." The Sergeant at Arms of the United States House of Representatives is similarly charged with maintaining order under the direction of the Speaker of the House.[8]

In November, 1972, appellee's Washington editor of *Consumer Reports* applied to the Periodical Correspondents' Association seeking accreditation of *Consumer Reports* to the Periodical Press Galleries of Congress. Accreditation by the Association provides members with certain privileges including special seating in the galleries, a variety of other facilities including telephones and typewriters in a room adjacent to the press galleries, entrance to the Senate Presidents' Room and House Speakers' Lobby, admission to the on-the-record daily press conferences held by the Senate leadership and the Speaker of the House, and facilitation of access to press conferences at the White House and administrative agencies.

Consumers Union's application for admission to the Periodical Press Galleries was rejected as heretofore noted by the Executive Committee on January 9, 1973, for the reason that *Consumer Reports* was "[n]ot an independent publication", as required by Rule Two of the Rules Governing Periodical Press Galleries. Upon review of this decision, the Chairman of the Committee on Rules and Administration of the Senate on June 14, 1973, advised Consumers Union that the Committee would abide by the previous decision.[9]

Appellee then brought the action below for declaratory relief, alleging that the Rules Governing Periodical Press

---

**7.** Affidavit of Donald E. Smith, Chairman of the Executive Committee of Correspondents of the Periodical Correspondents' Association.

**8.** It is not necessary to consider the situation of the Sergeants at Arms separately from that of the Association. Manifestly, if performing legislative acts, the Sergeants at Arms would have immunity at least equal to that of the Association, and there is no claim that they

took any affirmative action against appellee or did anything more than acquiesce in the decision of the Association.

**9.** On May 18, 1973, appellee wrote to the Speaker of the House of Representatives requesting intervention on its behalf. No response has been received by appellee as far as disclosed by the record.

Galleries are unconstitutional both on their face and as applied to *Consumer Reports.* Appellee contended, more particularly, that Rule Two constituted a prior restraint upon, and otherwise abridged, its rights to gather, have full access to, and report to its readers upon, news concerning Congress and of a public nature, in violation of appellee's rights under the First Amendment, and that in denying accreditation to *Consumer Reports* the Association acted in a discriminatory, arbitrary, capricious, and unreasonable manner, thus violating Consumers Union's rights under the Fifth Amendment.

Both sides moved for summary judgment. On October 11, 1973, the court entered a declaratory judgment in favor of appellee. It determined that the case was justiciable, that legislative immunity by virtue of the Speech or Debate Clause did not attach to the appellants who were non-members of Congress, and that the portion of Rule Two as interpreted by the Executive Committee of the Association to exclude the advocatory press was arbitrary, capricious and unreasonable, and constituted abridgment of freedom of the press, denial of equal protection of the laws, and deprivation of liberty and property without due process of law.[10]

We need not reach other issues, for we agree with appellants that this case is nonjusticiable.

*Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), teaches that at least two determinations must be made to sustain justiciability:

"First, we must decide whether the claim presented and the relief sought are of the type which admit of judicial resolution. Second, we must determine whether the structure of the Federal Government renders the issue presented a 'political question'—that is, a question which is not justiciable in federal court because of the separation of powers provided by the Constitution." 395 U.S. at 516–17, 89 S.Ct. at 1961.[11]

Regardless of whether our conclusion could lie wholly within the scope of the second inquiry, we are of the opinion that this case is nonjusticiable because it involves matters committed by the Constitution to the Legislative Department and as to which the acts of the appellants, under the circumstances, did not breach the limits of legislative immunity.

We need not follow point by point the arguments of the parties concerning freedom of the press and of association. Although we have been mindful of these, as well as of the underlying legislative premise pursuant to which the association acted, it has become apparent that this is a case in which "it is unnecessary to engage in any delicate balancing of . . . [legislative consideration] against the legitimate demands of the First Amendment." *Saxbe v. Washington Post Co.,* 417 U.S. 843, 849, 94 S.Ct. 2811, 2814, 41 L.Ed.2d 514 (1974). Cf. *Los Angeles Free Press, Inc. v. City of Los Angeles,* 9 Cal.App.3d 448, 88 Cal. Rptr. 605 (1970), cert. denied, 401 U.S. 982, 91 S.Ct. 1193, 28 L.Ed.2d 334 (1971). See also *Eastland v. United States Servicemen's Fund,* —— U.S. ——, 95 S.Ct. 1813, 44 L.Ed.2d 324 (No. 73–1923, 1975), *supra.* The accreditation policy here did not place the appellee in any less advan-

---

**10.** Plaintiff-appellee moved below to amend the judgment to require the Association to accredit *Consumer Reports* to the Periodical Press Galleries pending defendants' appeal, the motion being denied. Its applications for injunction pending appeal subsequently were denied without opinion by a panel of this court and by the Chief Justice.

**11.** In similar view this court in United States Servicemen's Fund v. Eastland, 159 U.S.App. D.C. 352, 488 F.2d 1252 (1973), rev'd on other grounds, sub nom., Eastland v. United States Servicemen's Fund, —— U.S. ——, 95 S.Ct. 1813, 44 L.Ed.2d 324 (No. 73–1923, 1975), noted that there are:

". . . two limitations upon the exercise of judicial power: (1) Is the question presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process? and (2) Has resolution of the question been entrusted to the judiciary under the Constitution?"

tageous position than the public or the press generally; limitations were based upon distinctions applied to it as well as to others in similar situations; appellants as we shall see were agents acting within the sphere of legitimate legislative activity; beyond declining to accredit *Consumer Reports,* none of the appellants took any action or enforced any orders against appellee, and the internal rules involved constituted a demonstrable constitutional commitment to the legislative branch of government. Cf. Powell v. McCormack, *supra.* While we do not reach the merits of appellee's claim that its constitutional rights have been impaired, this assurance that the action in question is not so facially violative of constitutional guarantees as to commend reexamination of established principles concerning justiciability in the particular context of this case avoids the necessity of further extending this opinion.

 A case may involve a nonjusticiable political question if, among other things, "a textually demonstrable constitutional commitment of the issue to a coordinate political department" is involved. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

United States v. Ballin, 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892), deals with power committed to Congress to "determine the Rules of its Proceedings" by virtue of Art. I, § 5:

"The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate

fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time. The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal."

 It is quite apparent from the text of the rule in question in light of legislative history that its purpose is to assure that the Periodical Press Galleries, within space limitations, will be used by *bona fide* reporters who will not abuse the privilege of accreditation by importuning Members on behalf of private interests or causes to which lobbying or advocacy groups are committed. The manner of assuring independence of those accredited from such groups or interests is for the Congress to determine as a matter of constitutional power.[12]

Such power over the internal proceedings of the Congress in itself would appear to establish the nonjusticiability of this cause were it not for the contention that Rule 2 and its interpretation by the Association infringed upon appellee's

**12.** The rules governing access to the galleries historically have incorporated some form of prohibition against the admission of persons who might importune Congressmen on behalf of private interests as has been seen. The present Rules Governing Press Galleries require correspondents to certify that "he or she is not engaged in paid publicity or promotion work" nor "in any lobbying activity". Cong. Directory, 94th Cong., 1st Sess., at 871 (1975). The same is required of photographers under the Rules Governing Press Photographers' Gallery. *Id.,* at 911. And radio and television correspondents must certify not only that they are not engaged in "lobbying" but also that

they are not engaged in the "promotion of legislation pending before Congress, the Departments, or the independent agencies." *Id.,* at 923. When the Periodical Press Galleries were established in 1941, the Rules Governing Periodical Press Galleries to similar effect provided that all periodicals desiring admission be "owned and operated independently of any industry, business, association, or institution". Cong. Directory, 77th Cong., 1st Sess. 740 (1941). This provision is retained in Rule 2 of the present version of those rules. Cong. Directory, 94th Cong., 1st Sess. 938–939 (1975).

constitutional rights and therefore a question proper for judicial consideration necessarily is presented.[13] We need not pause to consider such a formulation in the abstract, but turn to the effect of the Speech or Debate Clause [14] to settle whether despite the claim of constitutional violation, tenuous as we have noted or otherwise, this case is yet nonjusticiable.

The problem here is twice removed from United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), and United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), although the discussions there of governing principles, which need not be repeated, illuminate the solution. Here we are not concerned with claimed bad faith or illegal conduct. We are dealing in effect with "acts that occur in the regular course of the legislative process," *Brewster*, 408 U.S. at 525, 92 S.Ct. at 2544, although perhaps not with the legislative process itself. And we are concerned within the scope of that process with internal rules of the Congress.[15] Although the related immunity afforded by the Clause to Members of Congress appears plain, it is questioned by appellee, on reasoning similar to that of the court below,[16] that it protects the Periodical Correspondent's Association and the Sergeants at Arms of the House and Senate.

The Supreme Court came to grips with a variation of the problem in Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). An aide of Senator Gravel was subpoenaed by the Grand Jury for questioning with relation to the introduction into a subcommittee report and private publication of the "Pentagon Papers" and the Speech or Debate Clause immunity was invoked. Mr. Justice White, writing for the court states:

"We have little doubt that we are neither exceeding our judicial powers nor mistakenly construing the Constitution

**13.** Appellee relied primarily upon the statements in United States v. Ballin, 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892), *supra*, that "[Congress] may not by its rules ignore constitutional restraints or violate fundamental rights . . . ."

**14.** Art. I, § 6: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance· at the Session of their Respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."

**15.** While point is made by appellee of the collateral benefits accruing to correspondents as a result of accreditation to the Periodical Press Galleries, it has not been suggested that if refusal of such accreditation, as such, were proper otherwise, it would become improper by reason of these related privileges. On the other hand, these collateral benefits emphasize the relationship of accreditation to purely internal matters and machinery of the Congress.

**16.** The trial court considered the "internal rule" and the "immunity" aspects as entirely separate. It disposed of the first by stating: "Although the courts will not normally interfere with the manner in which Congress chooses to regulate its internal procedures, it is well established that a congressional rule which infringes upon the constitutional rights of persons other than Congressmen presents a proper question for the judiciary", citing the dissenting opinions in Yellin v. United States, 374 U.S. 109, 143–144, 83 S.Ct. 1828, 10 L.Ed.2d 778, and United States v. Ballin, 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321. We do not read these cases so broadly; particularly we do not think their teaching is that in determining the justiciability of· constitutional claims the merits of those claims is necessarily to be assumed or determined in a case such as this. As to immunity, the lower court held that in the absence of an affirmative showing by appellees "that if members of the press whose publications advocate a particular point of view are admitted to the galleries, congressional proceedings will be impeded or disrupted . . . it must be concluded that the Speech and Debate Clause does not shield the defendants from a challenge to their admission policies." No matter what argument for such a conclusion might be made in different and isolated context, we think that in connection with execution of an internal rule of Congress with the broad justification so apparent here, it was unwarranted to presume a non-legislative purpose as against which the burden must be upon appellants to particularize grounds as a condition for immunity under the Speech or Debate Clause.

by holding that the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." 408 U.S. at 618, 92 S.Ct. at 2623.

Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1881); Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), and Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), *supra,* were distinguished on the ground that these involved questions of illegal conduct.

In Doe v. McMillan, 412 U.S. 306, 320, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), it is indicated that immunity would be extended not only to Members sitting on a congressional committee, and to the staff, consultant and investigator of the committee, but to the Public Printer and Superintendent of Documents had they been engaged in legislative functions. Employing the *Gravel* test it still must be determined whether the particular acts considered here would qualify for immunity if performed by a Member himself.

In *Kilbourn,* 103 U.S. at 204–5, the court stated:

"It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it."

In *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627, the court further explained:

"Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.' United States v. Doe, 455 F.2d, at 760."

In United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), *supra,* the scope of the Clause was examined in the context of the prosecution on bribery charges of a former United States Senator; it was found that immunity did not attach. Acknowledging the possibly broad interpretation to which *Kilbourn* and *Johnson* might be subjected—especially the language of *Johnson* that all conduct "related to the due functioning of the legislative process" may be included in the Clause—the Court distinguished

". . . a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress. . . . Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the Court has regarded the protection as reaching only those things 'generally done in a session of the House by one of its members in relation to the business before it,' Kilbourn v. Thomp-

son, *supra,* 103 U.S. at 204, [26 L.Ed. 377,] or things 'said or done by him as a representative, in the exercise of the functions of that office,' Coffin v. Coffin, 4 Mass. 1, 27 (1808). . . . only acts generally done in the course of the process of enacting legislation were protected."

Decided the same day as *Brewster, Gravel* further focused the scope of the "legislative process" upon integral parts of the deliberative and communicative process with respect to the consideration and passage or rejection of proposed legislation. As part of the explanation, we think presaging the present situation, the Court included as within the reach of the Clause "matters which the Constitution places within the jurisdiction of either House". Doe v. McMillan, 412 U.S. at 317, 93 S.Ct. at 2027, *supra,* held that the Public Printer and Superintendent of Documents would be protected in internal distribution of documents to Members of Congress, but that "general, public distribution beyond the halls of Congress . . . and beyond the apparent needs of the '*due* functioning of the [legislative] process', United States v. Brewster, 408 U.S. 516, 92 S.Ct. 2531, 33 L.Ed.2d 507," was not protected. But the Court in its most recent interpretation of the clause has emphasized the absoluteness of its bar when the sphere of legislative activity is involved as well as the necessity of a broad reading to effectuate its purposes. Eastland v. United States Servicemen's Fund, —— U.S. ——, 95 S.Ct. 1813, 44 L.Ed.2d 324 (No. 73–1923, 1975).

██ There can be no reasonable contention that appellants were acting in a private capacity or not pursuant to rules validly enacted by Congress. It is conceded that they were acting in good faith. It is evident in view of Doe v. McMillan, *supra,* that they were occupying those types of positions to which immunity could attach if they were engaged in protected legislative activity. For many years the Congress itself had directly controlled the seating of the press within its halls. The increasing complexities of legislative processes rendered it entirely proper for the delegation of the day to day control of the galleries to "aids and assistants". See *Gravel,* 408 U.S. at 616–618, 92 S.Ct. 2614. Appellants were acting by virtue of an express delegation of authority as aides or assistants of Congress. If their actions would have been immune from inquiry under the Speech or Debate Clause had they been performed by Members of Congress, the same immunity would attach to appellants.

Although to the extent that they participated in the administration of the galleries appellants were not engaged in the consideration and passage or rejection of proposed legislation, *Gravel* at 625, 92 S.Ct. 2614, neither were they performing acts analogous to unlawful arrest, *Kilbourn,* 103 U.S. at 200, 26 L.Ed. 377, private publication of government documents, *Gravel,* 408 U.S. at 625, 92 S.Ct. 2614, nor engaging in political activities, *Brewster,* 408 U.S. at 512, 92 S.Ct. 2531. They were enforcing internal rules of Congress validly enacted under authority specifically granted to the Congress and within the scope of authority appropriately delegated by it. They were engaging in a sense in acts generally done in relation to the business before Congress, cf. *Kilbourn,* 103 U.S. at 204, 26 L.Ed. 377, "an integral part of the deliberative and communicative processes", *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627. They fell within "the sphere of legislative activity", Eastland v. United States Servicemen's Fund, *supra,* 95 S.Ct. at 1813. Rule 5, *supra,* 169 U.S.App.D.C. at ——, 515 F.2d at 1345, provided that the Executive Committee's actions are "subject to the approval and supervision of the Speaker of the House of Representatives and the Senate Committee on Rules and Administration." The Association's interpretation of the rules was approved expressly by the Senate Committee and at least acquiesced in on the House side. The Association was performing delegated legislative functions; in fact these were an integral part of the legislative machinery. There would be neither justifi-

cation nor authority for the courts to enforce judicial views as to how the rule could be better drafted to accomplish its purposes. Cf. United States v. Smith, 286 U.S. 6, 52 S.Ct. 475, 76 L.Ed. 954 (1932).

By reason of circumstances peculiar to this case, we find it unnecessary and, indeed, improper to consider the constitutional commitment of power over internal rules to the Congress and the Congressional immunity by virtue of the Speech or Debate Clause in isolation from each other. The execution of internal rules is so identified with the legislative process as to lend additional force to the historic legislative treatment of the subject of the rule in question. We conclude that the activity of appellants was within the anticipations of *Gravel* when, in delineating legislative acts, it was said that in addition to the direct business of passage or rejection of proposed legislation, the Clause applied to "other matters which the Constitution places within the jurisdiction of either House," 408 U.S. at 625, 92 S.Ct. at 2627.

Appellants say that "it is unnecessary to speculate as to whether this action would have been protected under the Speech or Debate Clause *if* it had been performed by Members of Congress because the identical action *was* performed by Members of Congress," through adoption of appellant's action by the Senate Committee on Rules and Administration. Whether a clearly non-legislative decision made by non-members would be immunized from judicial scrutiny when ratified expressly by Members of Congress need not be decided in the context of this case. Cf. Powell v. McCormack, *supra.* We are content to rest our ruling that this cause is not justiciable upon the ground that, performed in good faith, the acts of appellants were within the spheres of legislative power committed to the Congress and the legislative immunity granted by the Constitution. But the fact that they were ratified by the Senate Committee and at least acquiesced in by the Speaker of the House not only is supportive of

their occurrence within the scope of the legislative process but indicative that they were of a nature which the legislative judgment regarded proper.

The judgment of the district court is reversed, and the case remanded with direction for its dismissal as one not justiciable by reason of the textually demonstrable commitment of such rules to the legislative branch of government and in view of immunity conferred by the Speech or Debate Clause of the Constitution.

Reversed and remanded.