Ronald R. HUTCHINSON, Plaintiff-Appellant,

v.

William PROXMIRE and Morton Schwartz, Defendants-Appellees.

Nos. 77–1677, 77–1755.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1978.

Decided June 30, 1978.

Rehearing and Rehearing In Banc Denied July 26, 1978.

David E. S. Marvin, Lansing, Mich., for plaintiff-appellant.

Alan Raywid, Washington, D. C., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, WOOD, Circuit Judge, and EAST, Senior District Judge.*

CASTLE, Senior Circuit Judge.

This civil suit against a United States Senator and his legislative aide for damages arising from one of the Senator's monthly "Golden Fleece" awards involves the interplay of the immunities provided by the Speech or Debate Clause and the first amendment. The issues on appeal are (1) whether the alleged activities of the congressional defendants were within the legitimate legislative sphere and thus absolutely immune from suit and (2) to the extent those activities are not absolutely protected by the Speech or Debate Clause, whether the statements complained of are protected by the qualified privilege of the first amendment. The district court found that the combination of the absolute and qualified immunities completely shielded the defendants and granted their motion for summary judgment. We affirm.

I.

The facts as alleged by plaintiff are fully stated in the opinion below. *Hutchinson v.*

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, is sitting by designation.

*Proxmire,* 431 F.Supp. 1311 (W.D.Wis.1977), and will be briefly summarized here. Defendant William Proxmire is a United States Senator from Wisconsin who serves on the Senate Committee on Appropriations. In March, 1975, Senator Proxmire announced in a speech on the Senate floor that he was establishing his "Golden Fleece of the Month Award" the aim of which was to point out examples of wasteful government spending. Senator Proxmire's legislative aide, Morton Schwartz, was assigned to identify and investigate possible "Fleece" candidates.

After a review of agency documents and discussions with the various agencies' officials, the defendants decided they would give a Golden Fleece award to the National Science Foundation (NSF), the Office of Naval Research (ONR), and the National Aeronautics and Space Administration (NASA) for spending $500,000 to fund research by plaintiff Dr. Ronald Hutchinson into the causes of animal and human aggression. Defendants delivered a press release to the Senate Service Department on April 15, 1975 for release April 18 which, in essence, was the text of a speech scheduled to be given before the Senate by Senator Proxmire on April 18.[1] In his speech, Senator Proxmire characterized the research as merely studying why "rats, monkeys and humans bite and clench their jaws." Also, on or about April 15, 1975, Schwartz telephoned Dr. Hutchinson to inform him of the upcoming award and to verify the information contained in the speech. In rebuttal, Dr. Hutchinson then issued his own press release also dated April 18, 1975. In May, 1975, Senator Proxmire sent approximately 100,000 newsletters to his constituents and others summarizing the Golden Fleece Award.[2] Later in 1975, in addition to other interviews, Senator Proxmire appeared on a Milwaukee radio show and the Mike Douglas television show to discuss the Golden Fleece Awards including the one given to NSF, ONR, and NASA.[3] Following the April 18, 1975 announcement of the award, plaintiff alleges defendant Schwartz made several followup phone calls to NSF, ONR, and the National Institute of Drug Abuse (NIDA), and possibly other agencies, encouraging them to terminate the funding of Dr. Hutchinson's research.

■ Dr. Hutchinson filed this action seeking $8,000,000 in damages for injury to his reputation, for physical illness, mental distress, invasion of privacy, and loss of existing and prospective economic advantage. Defendants, claiming immunity from suit, moved for summary judgment and filed numerous supporting documents. Plaintiff opposed the motion with equally voluminous documentation. The district court, in a scholarly opinion, granted Senator Proxmire's motion for summary judgment and later dismissed the suit against Schwartz. This appeal followed.[4]

---

1. The press release is attached to this opinion as Appendix A.

2. This newsletter is attached as Appendix B. A second newsletter repeated the substance of the first and stated that all funding of the studies involved had been ended.

3. The relevant dialogue from the Mike Douglas Show is set forth below:

> Mike Douglas: You gave another award to a research project studying angry rats.
> Senator Proxmire: Well it was angry monkeys, rats and humans. It was a study that cost $500,000 to find out why people, rats and monkeys clench their jaws. They found out they clench their jaws when they were angry, when they were prodded by sticks, when they were hungry, and they didn't clench their jaws as much if they had been drinking.

> Mike Douglas: You know we're laughing at this but this is really really . . .
> Senator Proxmire: Oh it's terrible.

4. The district court granted Senator Proxmire's motion for summary judgment on April 22, 1977 (77–1677) and the motion to dismiss defendant Schwartz on June 22, 1977 (77–1755). As stated below, see note 5 *infra,* since we find the legal status of the defendants to be identical, we affirm both rulings for the same reasons.

We note that in cases involving the assertion of the immunities raised here, dismissal or summary judgment, when proper, is necessary to prevent the possible harassment of a full-fledged lawsuit; the precise harassment the legislative and first amendment immunities were designed to prevent. *See Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (Speech or Debate Clause

## II.

■ Several recent cases have interpreted the scope of the absolute immunity provided legislators and their aides under the Speech or Debate Clause in suits stemming from investigations.[5] While actual speech in either House is unquestionably protected, the Clause also protects other acts by representatives when those acts are found to be within the "legitimate legislative sphere." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).[6] The act of investigation is an "appropriate auxiliary to the legislative function" and legislators have been found to be within the legislative sphere when the subject of the investigation was one on which Congress could legislate and when the information sought from material witnesses furthered that subject. *McGrain v. Daugherty,* 273 U.S. 135, 174, 177, 47 S.Ct. 319, 328, 71 L.Ed. 580 (1927); *Watkins v. United States,* 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).[7] However, even where the investigation is within

the legislative sphere, absolute immunity does not attach to the improper dissemination of actionable information outside Congress, *Doe v. McMillan,* 412 U.S. 306, 316, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. 2614, nor to illegal or unconstitutional acts committed during the investigation. *United States v. Brewster,* 408 U.S. 501, 526, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).[8] Equipped with these basic principles, we will now determine if absolute legislative immunity bars suit upon the acts complained of by the plaintiff. For the purposes of analysis, we divide the allegations in this case into four separate acts: (1) the follow-up phone calls to administrative agencies; (2) the press release of the speech; (3) the newsletters; and (4) the television, radio, and other interviews.

### 1. *Follow-up Phone Calls to Agencies*

Plaintiff agrees that the investigative actions by defendants in gathering information on public spending from administrative

---

protects legislators from the burden of defending against a lawsuit as well as from the results of the lawsuit); *Grzelak v. Calumet Publishing Co., Inc.,* 543 F.2d 579, 582 (7th Cir. 1975) (summary judgment minimizes the chilling effect libel suits have on first amendment rights).

**5.** *See* Comment, *McSurely v. McClellan: Civil Suits Under the Speech or Debate Clause,* 71 Nw.U.L.Rev. 783 (1977) [hereinafter cited as Northwestern Comment].

The Speech or Debate Clause states: "for any Speech or Debate in either House, they [members of Congress] shall not be questioned in any other Place." U.S.Const. art. I, § 6. Generally, legislative aides are entitled to the same Speech or Debate Clause protection as the representatives they serve. *Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). In the present action, we view the immunity available to Senator Proxmire and his aide, Morton Schwartz, to be identical.

**6.** The Court stated in *Gravel*:
The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceed-

ings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
408 U.S. at 625, 92 S.Ct. at 2627. *See generally* Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers,* 86 Harv.L.Rev. 1113 (1973).

**7.** We find unpersuasive plaintiff's argument that these cases do not involve Speech or Debate immunity but only the power of Congress to investigate. Language from *McGrain* and *Watkins* is frequently used in Speech or Debate cases involving investigations as the test for application of legislative immunity. *E. g., Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 505–06, 95 S.Ct. 1813; Northwestern Comment, *supra* note 5 at 788 n.39.

**8.** An example of a civil suit based upon claims of unconstitutional acts is *McSurely v. McClellan,* 180 U.S.App.D.C. 101, 553 F.2d 1277 (1976) (en banc), *cert. dismissed as improvidently granted sub nom., McAdams v. McSurely,* —— U.S. ——, 98 S.Ct. 3116, 56 L.Ed.2d —— (1978). It is not contended that the tort claims here are of constitutional dimensions. *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

agencies is not actionable under the Speech or Debate Clause since the investigation was within the legislative sphere. *McGrain v. Daugherty, supra.* However, Dr. Hutchinson argues that when the defendants made the phone calls to the agencies encouraging them to terminate the research grants, they exceeded the legitimate information gathering protected by legislative immunity. The phone calls, plaintiff alleges, were made for the purpose of influencing the agencies and not for the gathering of information. In response, defendants maintain that the follow-up contact with the agencies was part of the legislature's oversight function and thus should be accorded Speech or Debate protection.

■■ The thrust of legislative immunity is the protection of the "deliberative and communicative processes" of representatives. *Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. 2614. It can be argued that each of the nonlegislative functions of Congress, *i. e.,* investigative, oversight, informing, assist representatives in their legislative deliberations and communications. However, the Supreme Court has specifically stated that contact with administrative agencies is normally too far removed from the legislative sphere to be absolutely protected:

> Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity. *United States v.*

*Johnson* [383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)] decided at least this much.

*Gravel v. United States, supra,* at 625, 92 S.Ct. at 2627. *See also McSurely v. McClellan, supra,* note 8, 180 U.S.App.D.C. at 109–110, 553 F.2d at 1285–86. Thus, while there may be cases where the postinvestigation contact with administrative agencies is so integral to the investigation or other protected activities that application of absolute immunity would be compelled, the phone calls to NSF, NASA, and NIDA in this case cannot be accorded Speech or Debate protection.[9]

### 2. *Press Release, Newsletters, Television and Radio Comments*

■ To determine whether the remaining allegations of plaintiff are actionable under the Speech or Debate Clause, we must explore the limits of permissible public dissemination of information by a representative. The Supreme Court has rejected the argument that the "informing function" of Congress requires absolute immunity for all public distribution of information. *Doe v. McMillan, supra,* 412 U.S. at 316, 93 S.Ct. 2018. *Doe* held that the Speech or Debate Clause protected representatives and their legislative aides from suit for voting to authorize the public distribution of an actionable committee report. However, the Court further held that absolute immunity was not automatically available to the Public Printer and Superintendent of Documents who actually distributed the report and remanded the case for a determination of whether the "legitimate legislative needs" of Congress had been exceeded.[10]

---

**9.** The district court did not specifically address the Speech or Debate status of the follow-up phone calls. It appears, however, that the court below viewed these actions as merely a part of the total investigation and therefore absolutely privileged. 431 F.Supp. at 1321 22. In light of the language in *Gravel,* we must disagree.

**10.** On appeal after remand, *Doe v. McMillan,* 566 F.2d 713 (D.C.Cir.1977), *cert. denied,* · · U.S. , 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978), the D.C. Circuit upheld the district court's finding that the routine distribution of the actiona-

ble report "did not exceed the legitimate legislative needs of Congress." *Id.* at 715. *See also Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. 2614 (Senator's direct arrangements with a private printer to publish classified information was "in no way essential to the deliberations of the Senate").

It appears that while the representatives and their legislative aides are automatically immune from suit when authorizing public dissemination of information, both can become subject to showing "legitimate legislative needs" if they actually distribute actionable material outside Congress. In the latter in-

Thus, while the Supreme Court has recognized that the informing function of Congress is sufficiently important to warrant Speech or Debate immunity for some public dissemination of information, *Id.* at 317, 328, 93 S.Ct. 2018 (Douglas, J., concurring), 333, 93 S.Ct. 2018 (Blackmun, J., concurring and dissenting), 341, 93 S.Ct. 2018 (Rehnquist, J., concurring and dissenting), the distribution outside Congress must serve legitimate legislative needs to afford the actual distributor absolute immunity. The key factor in determining the amount of distribution that is within legislative needs is the extent of the dissemination. *Id.* at 324, 93 S.Ct. 2018.[11]

Following the particularized inquiry, into the legislatively necessary extent of public distribution outlined in *Doe,* we agree with the district court that the press release in this case was protected by absolute immunity. It is uncontested that the release, which is virtually identical to the speech by Senator Proxmire, was routinely distributed to the Senator's general media list which was placed on file in the Senate Service Department (Shuman Affidavit ¶¶ 8–11). The release merely served to call attention to the speech which was in the public record.[12] Given the enormous amount of material addressed by Congress each day, strategic press releases may serve to alert a representative's colleagues about

a matter of particular importance as well as to inform the appropriate federal agencies and the public who can then comment on proper legislative action. We find the limited facilitation of press coverage of congressional action in this case to be protected by the Speech or Debate Clause. *Cf. Consumer's Union of United States, Inc. v. Periodical Correspondents' Association,* 169 U.S.App.D.C. 370, 379–380, 515 F.2d 1341, 1350–51 (1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976) (management of congressional press galleries, though entrusted to private association, is protected by the Speech or Debate Clause).[13]

We also find that the Speech or Debate Clause protects any otherwise actionable material contained in newsletters mailed to Senator Proxmire's constituents. As noted above, the informing function of Congress was given limited Speech or Debate protection by the Supreme Court in *Doe v. McMillan, supra.* If the informing function, even though limited, is to be accorded any absolute immunity, it must be in a case such as this. Senator Proxmire's newsletter informed his constituents of his actions in connection with overseeing public funds which were part of his general duties as a Senator and his particular responsibilities as a member of the Senate Committee on Appropriations. Denying a representa-

---

stance, representatives and their legislative aides are treated in the same manner as nonlegislative functionaries such as the Public Printer. *See Doe v. McMillan,* 566 F.2d at 715 n.1. We assume, according to plaintiff's allegations, that defendants actually distributed the actionable materials here and cannot claim to have merely "authorized" their distribution.

11. While the extent of the public dissemination was the only factor noted by the Supreme Court in *Doe,* implicit recognition was also given to the importance of the type of information being distributed; *i. e.,* committee reports, floor speeches, proposed legislation. Presumably, certain types of information would require greater public distribution to properly serve legislative needs.

12. Plaintiff claims the press release, dated April 18, 1975, was actually made public April 15, three days before the speech. Assuming, as we must, that plaintiff is correct, we do not see

how the timing of the release affects this case. There is no claim that Senator Proxmire attempted to create absolute immunity after the fact by reading the release in the Senate. The wording of the press release belies any such contention.

13. The district court held that the "press release, in a constitutional sense, was no different than would have been a television or radio broadcast of his speech from the Senate floor." 431 F.Supp. at 1325. This statement might be an overstatement since it is unlikely that all exact duplications of congressional speeches would enjoy the unquestioned absolute immunity accorded actual speech in the House or Senate. See note 6 *supra.* However, we agree with the district court that the form of distribution of the questioned material has an effect upon the extent to which its dissemination can still be considered to serve legislative needs.

tive protection for newsletters to his constituents in circumstances such as this would effectively isolate the legislator from the people who elected him. *Id.* 412 U.S. at 333, 93 S.Ct. 2018 (Blackmun, J., concurring and dissenting). The subject matter and language of the newsletters make this case factually distinct from *Doe. Id.* at 328–29, 93 S.Ct. 2018 (Douglas, J., concurring).

■ However, any defamatory remarks made by Senator Proxmire in television, radio, and other interviews are not protected by absolute immunity. We view this form of public dissemination of information, absent special circumstances, to be too far removed from serving legitimate legislative needs to be within the limited reach of the protected informing function. Such methods of reaching the public are generally not necessary to carry out a representative's informing function and are more frequently used for political purposes. *United States v. Brewster, supra,* 408 U.S. at 512, 92 S.Ct. 2531. While there might be a case where distributing actionable information through television and radio interviews would be viewed as serving legislative needs, the type of distribution alleged here does not suggest that situation.

Finding that television and radio interviews and the follow-up telephone conversations with administrative agencies urging the cut-off of funds are not absolutely immune under the Speech or Debate Clause, we must now determine whether the statements made in those communications are protected by the qualified privilege of the first amendment right to free speech.

### III.

Regarding the statements which were unprotected by an absolute Speech or Debate immunity, the court below, after careful analysis, found (1) that Dr. Hutchinson was both a public official and public figure and there was no showing of "actual malice" under the doctrine of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and (2) that even if Dr. Hutchinson was a private person, the statements did not constitute defamation under

the applicable local law. 431 F.Supp. 1325–33. After having independently examined the record, *Fadell v. Minneapolis Star and Tribune Co., Inc.,* 557 F.2d 107, 108 (7th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977), we agree with the district court that summary judgment was proper based upon first amendment grounds. Consequently, we need not decide whether the statements were actionable defamation under local law.

■ We agree with the district court that Dr. Hutchinson is a public figure and consequently must show that any false, defamatory statements were made with "actual malice," *i. e.,* actual knowledge that the statements were false or reckless disregard of their truth or falsity. *New York Times v. Sullivan, supra,* 376 U.S. at 279–80, 84 S.Ct. 710. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Public figures are those who (1) have the appropriate status which either exists by their position alone or is achieved by their voluntarily thrusting themselves into the " 'vortex' of an important public controversy" and (2) have "sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Id.* at 155, 87 S.Ct. at 1991. While governmental employees and contractors by their positions alone do not generally have such "persuasive power and influence that they are deemed public figures for all purposes," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), the nature and extent of an individual's participation in the particular matter may make him a public figure for that issue. *Id.* at 352, 94 S.Ct. 2997.

■ Here, there is no question that Dr. Hutchinson had actively solicited federal grants to pursue his research and had secured a substantial amount of public funds by his applications. (Defendants' Exhibits 82b, 83.) The plaintiff had also published numerous articles regarding his work (Plaintiff's Exhibits 64–96), and stories re-

garding his research had appeared several times in local papers. (Defendants' Exhibits 47–51.) In addition to his public status as to his research, it is evident from the record that plaintiff had sufficient access to the media to rebut any defamatory falsehood. Dr. Hutchinson's answering press release was quoted in detail in the same stories which initially reported the Golden Fleece Award. (Plaintiff's Exhibits 32–39.) Thus, Dr. Hutchinson had the appropriate status and access to the means of rebuttal to be considered a public figure with regard to the propriety of his research. *See Adey v. United Action for Animals, Inc.,* 361 F.Supp. 457, 460 (S.D.N.Y.1973), *aff'd,* 493 F.2d 1397 (2d Cir.), *cert. denied,* 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974) (NASA research scientist is public figure).[14]

■ Having found the plaintiff to be a public person and therefore subject to the *New York Times* standard, the district court granted summary judgment after finding that there was no issue of material fact as to whether the defendants had actual malice. 431 F.Supp. 1329–30. In order to show actual malice, plaintiff must prove by clear and convincing evidence that defendants had actual knowledge of the falsity of their statements or that defendants acted with a "high degree of awareness of . . . probable falsity." *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 342,

94 S.Ct. 2997. We agree with the district court that, upon this record, there is no question that defendants did not have knowledge of the actual or probable "falsity" of their statements.[15]

Dr. Hutchinson's main argument in this regard is that while failure to fully investigate generally does not establish reckless disregard for the truth, *St. Amant v. Thompson, supra,* defendants were on notice of the possible falsehoods since they possessed agency reports supporting the type of research and its cost. (ONR letter, Plaintiff's Exhibit 9 to Shuman Deposition.) In contrast, defendants' exhibits include correspondence from agencies which criticize plaintiff's research technique and project costs. (Defendants' Exhibit 90.) At best, this could be read to show there was a dispute as to the value of the research. This dispute by itself, however, is not sufficient to raise a question of material fact as to whether defendants had knowledge that their statement of opinion regarding the value of the research was actually or probably "false." In addition, it is unchallenged that defendants spent many hours investigating and verifying their information. (Schwartz Affidavit ¶¶ 10–20.) Defendants even telephoned Dr. Hutchinson before the press release was issued to inform him of its content. (Hutchinson Deposition pp. 389–90.) Defendants can also point to their extensive researching of

---

14. In light of our decision that Dr. Hutchinson is a public figure, we need not decide whether the district court was correct in holding that plaintiff was also a public official. 431 F.Supp. at 1327.

 *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), cited by plaintiff, is factually distinct from the present case. There, the Court found that Mrs. Firestone was not a public figure since she did not thrust herself into the forefront of a public controversy in order to influence its resolution by her divorce proceedings and related press conferences. *Id.* at 454 & n.3, 96 S.Ct. 958. In contrast, here Dr. Hutchinson was not forced to seek public funds and plaintiff's numerous articles and news stories which preceded his rebuttal press release demonstrate his public affirmation of the soundness of the research and the continued public funding thereof. *See also Gertz v. Rob-*

ert Welch, Inc., supra, 418 U.S. at 345, 94 S.Ct. 2997.

15. We note that the statements in the interviews constitute a personal opinion as to the value of plaintiff's work, rather than false statements of fact and thus may not be defamatory in a constitutional sense. *See Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). While the statements in the press release intimating that Dr. Hutchinson had made a personal fortune and that the research was "perhaps duplicative" may be defamatory falsehoods, that document, together with the newsletters, is absolutely immune under the Speech or Debate Clause. *See Part II supra.* In any event, we find the allegedly defamatory statements, including any action which may be premised on the documents being misleading, to be privileged under the first amendment.

Dr. Hutchinson's applications for federal grants and contracts as support for their opinions regarding plaintiff's "grantsmanship." (Defendants' Exhibits 82b, 83.) Under these circumstances, plaintiff has not presented facts which could demonstrate that defendants acted with a "high degree of awareness of . . . probable falsity." *St. Amant v. Thompson, supra,* 390 U.S. at 730–31, 88 S.Ct. at 1325. Therefore, we find that there is no genuine issue as to whether the defendants had actual malice in the constitutional sense and that summary action by the district court was proper. *See Grzelak v. Calumet Publishing Co. Inc., supra* note 4 at 583.

 Finally, plaintiff argues that even though the first amendment may shield the defendants from liability for defamation, the district court erred in not allowing a trial upon the other wrongs alleged in the complaint, *i. e.,* interference with contractual relations, intentional infliction of emotional anguish, and invasion of privacy. We view these additional allegations of harm as merely the results of the statements made by the defendants.[16] If the alleged defamatory falsehoods themselves are privileged, it would defeat the privilege to allow recovery for the specified damages which they caused.

For the reasons stated above, the judgments of the district court are

AFFIRMED.

## APPENDIX A

April 18, 1975 Press Release

Office of

## SENATOR WILLIAM PROXMIRE

Wisconsin

16. Although the harm caused by the follow-up phone calls might be argued to be independent of the defamatory statements, we see no constitutional distinction in their treatment. The torts allegedly stemming from the phone calls, interference with contractual relations and interference with prospective advantage, are

FOR RELEASE AFTER 6:30 A. M.
FRIDAY, APRIL 18, 1975

Senator William Proxmire (D.—Wis) announced on Friday, "My choice for the Golden Fleece Award for the biggest waste of taxpayers' money for the month of April goes jointly to the National Science Foundation, National Aeronautics and Space Administration and the Office of Naval Research for spending almost $500,000 in the last seven years to determine under what conditions rats, monkeys and humans bite and clench their jaws. From the findings of these studies it is clear that the Government paid a half million dollars to find out that anger, stopping smoking, and loud noises produce jaw clenching in people."

The Wisconsin Senator said, "This is the second in a series of 'fleece of the month' awards which will climax in a Biggest Waste of the Year Award.

"All this money was given to Dr. Roland [sic] R. Hutchinson of Kalamazoo State Hospital in Michigan. Last year alone the good doctor spent over $200,000 of which more than $100,000 were federal funds. And what are some of the other results reached by these research projects in the last seven years?

"Dr. Hutchinson told NASA that people get angry when they feel cheated and tend to clench their jaws or even scream and kick. NSF learned that Dr. Hutchinson's monkeys became angry when they were shocked and would try to get away from the shock. In addition, NSF was informed that drunk monkeys do not usually react as quickly or as often as sober monkeys and that hungry monkeys get angry more quickly than well-fed monkeys.

"The Office of Naval Research appears to have gotten the same type of so-called research as did the NSF and NASA.

based upon "malice" or other improper intent. W. Prosser, Law of Torts, §§ 129, 130 (4th ed. 1971). Where the constitutional right to free speech is involved, as it is here, the *New York Times* standard would be applicable to such an intent inquiry.

"It is very interesting to trace the history of these extremely similar and perhaps duplicative projects. In 1967, NSF gave Dr. Hutchinson $44,700 to study 'Environmental and Physiological Causes of Aggression.' For two years, Dr. Hutchinson studied the biting reactions of monkeys when they received electric shocks. He also compared their reaction while being given a number of different drugs as alcohol and caffeine. In 1969, the NSF gave Dr. Hutchinson another $26,000 to continue these experiments. He received another grant, this one for $51,200 in 1970 from the NSF.

"By this time Dr. Hutchinson was ready to extend his work to human biting and jaw clenching. In 1970, Dr. Hutchinson received a grant which ran for five years from the ONR to continue 'research on subhuman primates to determine the environmental, physiological and biochemical factors responsible for the maintenance of aggressive behavior and systematic replication of results objected in primates extended to human subjects.' Total funding from the Navy ran to $207,000.

"During this period, Dr. Hutchinson applied for and received a $50,000 grant from NASA to develop measurements of latent anger or aggression in humans by means of jaw-clenching. In addition, Dr. Hutchinson received his fourth NSF grant in 1972 for $51,800 in order to continue his experiments on monkeys and extend the work to human jaw-clenching.

"Dr. Hutchinson, who in addition, to being Research Director at Kalamazoo State Hospital, is also an Adjunct Professor at Western Michigan University and President of his own non-profit Foundation for Behavior Research, has proposals presently pending before the NSF, the National Institute of Drug Abuse, and the National Institute of Mental Health to continue research on monkeys' drinking, drug and jaw clenching habits. If Dr. Hutchinson is successful in this new grantsmanship attempt, he would receive an additional $150,000 of taxpayers' money.

"The funding of this nonsense makes me almost angry enough to scream and kick or even clench my jaw.

"Dr. Hutchinson's studies should make the taxpayers as well as his monkeys grind their teeth. In fact, the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer.

"It's time for the federal government to get out of this 'monkey business.' In view of the transparent worthlessness of Hutchinson's study of jaw-grinding and biting by angry or hard-drinking monkeys, it's time we put a stop to the bite Hutchinson and the bureaucrats who fund him have been taking out of the taxpayer."

Proxmire said that the public is urged to write him in Washington with suggestions for the "Golden Fleece of the Month" for May.

## APPENDIX B

### May, 1975 Newsletter

### ROMANTIC LOVE STUDIED

Each month I have decided to offer a "golden fleece" award to the organization or person who has most utterly wasted your tax dollars.

Last month's award went to the National Science Foundation for a study of why people fall in love. For $84,000 the researches were supposed to find out how people grow dependent upon each other in what they called "romantic love."

Not only is this a question that cannot be answered, like what is infinity, I'm not sure we want an answer. There should be some mysteries in life.

### A BITE OUT OF YOUR POCKETBOOK

This month the award is shared jointly by the National Science Foundation, National Aeronautics and Space Administration and the Office of Naval Research. These three organizations have put up $500,000 of your tax money to reach the astounding conclusion that people and monkeys clench their jaws when angry or forced to stop smoking or confronted with loud noise.

In seven years of work by Dr. Ronald R. Hutchinson of Michigan, your money was used to discover that people get angry when they feel cheated and they tend to clench their jaws or even scream and kick. Did you know that? Did you know that monkeys become angry when they are given electric shocks? Or that drunk monkeys do not react as quickly as sober monkeys? That's what your taxes paid for!

Dr. Hutchinson has received one grant after another from various federal bureaucracies to study these earth shaking problems. He has examined crayfish, wasps, boa constrictors, turtles, alligators, opossums, foxes, pigeons, rats, monkeys and humans to discover under what circumstances they show signs of being angry.

## TESTS ON ANIMALS

He has "stimulated" the animals by using physical blows, electric tail shocks, intense heat, brain probing, air blasts, foot shocks and loud noises. He has influenced them with morphine, tranquilizers, food, alcohol, caffeine and in the case of humans, with money.

He graduated from animals to humans in 1970. That's when he began to conclude that humans bite and clench their jaws under stress. And that when they feel cheated, they react by screaming and kicking on occasions.

These studies are continuing and several new proposals, if accepted, will mean another $150,000 for this program.

If this use of your tax money makes you want to kick and scream or clench your jaws, then join the club. The good doctor has made a monkey out of the federal bureaucrats.

I've told these government agencies it's time to get out of this "monkey business" and put an end to worthless studies be they scientific or social.

If you have any suggestions for my next "golden fleece" award, please write to me in Washington.