**William GILMOUR, Plaintiff,**

v.

**NEW YORK STATE RACING AND WAGERING BOARD et al., Defendants.**

**No. 75 Civ. 5829.**

United States District Court, S. D. New York.

Dec. 9, 1975.

---

Kissam & Halpin, New York City, for plaintiff; Anthony S. Genovese, Joel H. Blumkin, Richard J. Tufano, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendant New York State Racing and Wagering Board; Harold Tompkins, John M. Dailey, Asst. Attys. Gen., of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant Roosevelt Raceway, Inc.; John A. Guzzetta, Kenneth R. Logan, New York City, of counsel.

Dornbush, Mensch & Mandelstam, New York City, for defendant Yonkers Racing Corp.; Martin Mensch, Richard J. Schaeffer, New York City, of counsel.

Shearman & Sterling, New York City, for defendant Harness Tracks Security, Inc.; Andrew S. O'Connor, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, William Gilmour, a driver and owner of harness racehorses, moves for an order enjoining defendants Roosevelt Raceway, Inc. ("Roosevelt"), Yonkers Racing Corporation ("Yonkers") and New York State Racing and Wagering Board ("State Racing Board") from barring him from participation in harness races conducted by the defendants pending the trial and determination of this action on the merits.

Essentially plaintiff claims that he was deprived of his liberty and property without due process of law.[1] His

1. In his complaint plaintiff alleges four separate counts, charging violations of the First and Fourteenth Amendments to the Constitution of the United States, the Sherman Antitrust Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y.Gen.Bus.Law § 340 (Mc-

property is his employment; his liberty is his freedom to practice and to continue his chosen profession. These rights come within the liberty and property concepts of the Fourteenth Amendment and plaintiff is entitled to follow his profession free from unreasonable state interference.[2]

■ The first question is whether Roosevelt's[3] refusal to plaintiff of access to its facilities was state action. If this is answered in the affirmative, it follows that he was entitled to due process with respect to his termination at the raceway. The next and ultimate question is did plaintiff receive notice and "*some* kind of hearing"[4] sufficient to satisfy due process requirements?

■■ With plaintiff and defendants in sharp disagreement on the issue of "state action," the court assumes, only for the purpose of this motion for a preliminary injunction, that Roosevelt's termination of the use of its facilities was state action and that Gilmour was entitled to notice of the basis of the termination and an opportunity to be heard in resistance thereto. However, due process "does not require a trial-type hearing in every conceivable case of government impairment of private interest."[5] Each case must be decided on its own facts, and "consideration of what procedures due process may require un-

der any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."[6]

Harness racing is a sport enjoyed by many, but, like other national sports that attract huge audiences, it unfortunately has had its share of scandals. The owners of the raceways, no less than the state and its official agency, the State Racing Board, have a great stake in maintaining and protecting the sport's integrity against those who would despoil it. The state's interest essentially reflects the public interest that sports be honestly conducted, which extends to the avoidance of even the appearance of impropriety in connection with pari-mutuel betting. The state also has a substantial monetary interest since it receives vast sums from the proceeds of racing meets.

The raceway has a vital interest in protecting its investment, stated in the case of Roosevelt to be 75 million dollars. It also has an interest, and indeed an obligation, in supervising its activities at the raceway so that its patrons have confidence that the sport is honestly conducted. A breach of this obligation of proper supervision may result in forfeiture or denial of its annual license.

Kinney 1968). On this motion for preliminary relief, only the factual aspects of his claim of denial of due process of law have been presented. Gilmour's claims against a fourth defendant, Harness Tracks Security, Inc., are therefore not presently at issue.

2. *See Greene v. McElroy*, 360 U.S. 474, 493 n. 22, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Plaintiff's termination bears on both his reputation and integrity and his prospects for future employment. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 573–74, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

3. Roosevelt and Yonkers occupy different positions with respect to Gilmour's claim for preliminary relief. Although Yonkers afforded Gilmour no hearing of any kind before his termination, it appears that Gilmour notified Yonkers prior to his current dif-

ficulties that he would not race there during the current meet. In any event, only a few days of racing remain in that meet, which ends on December 13, 1975, and the court concludes that Gilmour has not made a sufficient showing of irreparable injury or hardship to warrant court-ordered reinstatement for so short a time. Accordingly, the balance of this opinion is limited to the relief sought against Roosevelt.

4. *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). *See* H. Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267 (1975).

5. *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

6. 367 U.S. at 895, 81 S.Ct. at 1748.

The failure to take swift and decisive action, unencumbered by the delay of a formal trial-type hearing, could also result in public scandal and ultimately a decrease in spectatorship, a substantial loss of revenues to the state and the race track, and even the potential decline of harness racing in general as a sport, with consequent loss of jobs and investments. In the past, suspicious race results have resulted in fans rioting at the race tracks, causing both personal injury and property damage.[7] Thus, the need to maintain strict vigilance against race fixing and to take immediate steps against dishonest drivers and owners is of prime importance in the long run and perhaps in the short run as well. It is important to the public no less than to those who run the raceways.

On the other hand, Gilmour's interest in pursuing his profession and maintaining his reputation is constitutionally protected against arbitrary state action. His continued termination at Roosevelt, one of the nation's biggest and most prestigious harness race tracks, would surely bring him into professional disrepute and seriously impair his livelihood as a driver and owner of racehorses. Accordingly, assuming, as we do solely for the purposes of this motion, that Gilmour was entitled to notice and some kind of hearing with respect to his termination at Roosevelt, the issue is narrowed to determining, in the light of the interests of the respective parties, whether the procedures afforded Gilmour were constitutionally adequate.

The various affidavits submitted by the parties on this motion establish the following undisputed facts:

The plaintiff was indicted with others in the United States District Court for the Eastern District of New York, charged with conspiracy to fix superfecta races at Roosevelt and Yonkers. After a long trial in 1974, at least one defendant was found guilty and a number were acquitted. Plaintiff was among those as to whom the prosecution failed to sustain its burden of proof. One Forest Gerry, a nondriver and nontrainer, was convicted as the alleged mastermind of the conspiracy. According to George Morton Levy, chief executive officer and general counsel to Roosevelt, who was familiar with the trial evidence, the evidence indicated that Gilmour had suspicious relations with Gerry.

Following the trial, Gilmour sought to race again at Roosevelt. Despite his acquittal, Roosevelt was reluctant to allow him to race at its track or to use its stalls, and it contends that it then had the right, in the exercise of a reasonable discretionary business judgment, to bar undesirable persons, whether race track touts, dishonest drivers, owners, or others, under the common law and the statute under which each race track is licensed by the state.[8] In any event,

---

7. Such an instance occurred after an exacta race at Yonkers in 1971.

8. *Jacobson v. New York Racing Ass'n*, 33 N.Y.2d 144, 350 N.Y.S.2d 639, 305 N.E.2d 765 (1973). *See* N.Y.C.R.R. § 4119.8:
"UNDESIRABLE PERSONS. Any person whether a licensee, participant or patron whose conduct is deemed detrimental to the best interest of harness racing or who is deemed an undesirable person may be expelled from the track. In this regard the track, on its own initiative, or upon request of the commission or its representatives, shall take immediate steps by whatever means are reasonably required to expel such person.

Acts deemed undesirable shall consist of, but not be limited by, the following:
(a) bookmaking or other illegal wagering or gambling;
(b) touting;
(c) creating or continuing a public disturbance;
(d) disorderly conduct;
(e) associating with undesirables;
(f) transmitting information to points outside the track;
(g) failure to appear when directed to do so by any official of the commission in furtherance of an investigation or hearing and to testify under oath concerning any

Roosevelt conditioned Gilmour's re-entry to its track, as well as the re-entry of other drivers involved in the Eastern District trial, upon their written agreement, in the event of any future investigations, to cooperate fully, to report any irregularities in racing that they observed, and to take a polygraph test whenever requested by management. Gilmour, represented by counsel, agreed thereto in June 1974, and thereafter availed himself of Roosevelt's facilities free of any restriction. Then, on September 18, 1975, an exacta race was run which Gilmour won; one McNutt placed second and Webster, another driver, placed sixth. That race and action taken thereafter by Roosevelt are at the center of this controversy.

We put aside whether inquiry about the race was caused by the spectators booing after it was over, since plaintiff denies that this occurred. But the morning following the race Jacques Dupuis, one of the drivers in the race, complained to the State Steward/Presiding Judge that he was crowded out by Webster— that Webster had ridden "shotgun" to keep other drivers from passing to assure that plaintiff and McNutt would finish first and second. Roosevelt management was advised of this complaint. Dupuis' version of the race was supported by another driver who was in a position to see and who felt that Webster had deliberately blocked Dupuis out. Roosevelt management also received complaints about the race from telephone callers. It reviewed the videotapes of the race. Inquiry soon exposed an unusual betting pattern on the particular race. Two strangers, in the closing minutes that the betting window was open,

had placed an unusually large bet of $5,000 on the exacta combination of "1" and "5", the numbers of the horses driven by Gilmour and McNutt, and immediately after the race collected between $28,000 and $32,000 on the winning combination and then disappeared. Heavy bettors are monitored at Roosevelt and they are known to its race track personnel; the winners in this instance were not known and to this day have not been identified. Based on these circumstances, management undertook an investigation.

On September 24, 1975, Gilmour, Webster and McNutt were invited to a meeting (McNutt did not attend) with George Morton Levy, Roosevelt's chief executive officer. Over the course of an hour-long session Gilmour and Webster were advised that complaints had been received and questions raised about the September 18, 1975 exacta race; that management was conducting an investigation; that the drivers had "a continuing obligation to take affirmative action to eliminate any suspicion that we have on any race here"; and that Roosevelt wanted them to adhere to their agreement and to take a lie detector test. Gilmour was fully apprised of the basis for the suspicion attending the exacta race, including the two unknown bettors and the amount of their bet, and also of the request that he submit to the test, although he was not asked for his side of the story in so many words.

On September 27, 1975, still before he was terminated, Gilmour, accompanied by his then lawyer, attended a second session with Levy and other Roosevelt executive officers. The meeting lasted for one and one-half hours and again

facts within his knowledge and produce any books, records, written matter or other evidence within his possession or control relevant to such matter.

In addition a person who has been convicted of a crime involving moral turpitude, or who has been convicted of bookmaking or other form of illegal gambling, or who has been adjudged by any court, State commission, or other governing body

guilty of any fraud in connection with racing, or any athletic contest shall be deemed an undesirable person and shall be subject to expulsion as provided in this section. Nothing contained in this section shall diminish the right of any track to exclude any person as a patron or otherwise without reason provided such exclusion is not based upon race, creed, color or national origin."

Gilmour and his counsel were informed of the basis for Roosevelt's concern about the questioned race and why the polygraph test was proposed, and again Levy renewed his request that Gilmour comply with the agreement which had conditioned his readmission to the race track following the 1974 superfecta trial. Instead of consenting thereto, his lawyer, in Gilmour's presence, sought to disavow the agreement, arguing that the test was unreliable and charging that management was engaged in a "witchhunt" or "fishing expedition." Finally, on the advice of his counsel, Gilmour refused to abide by the agreement. Thereupon he was denied the privileges of the Roosevelt race track.

The fact is that, at the initial stages of its inquiry, Roosevelt was endeavoring to keep the investigation confined, and, if it developed that the suspicion surrounding the race was unfounded or unsubstantiated, to avoid an independent inquiry by the State Racing Board, which at once would have generated undesirable publicity as to plaintiff, as well as others. Any claim by plaintiff that Roosevelt was motivated by hostility toward him is repelled by the record. Roosevelt had been tolerant of plaintiff's past shortcomings. Prior to the Eastern District charges Gilmour had been involved in infractions of the law and in questionable practices at several race tracks. Roosevelt, and particularly Levy, had befriended him notwithstanding his aberrant conduct. When plaintiff persisted in his refusal to cooperate and was adamant in resisting the polygraph test, the situation became public with attendant adverse publicity.

Later, represented by his present attorney, Gilmour offered to take the test, but Roosevelt made it clear that this would not, by itself, terminate its ongoing investigation, and that if plaintiff undertook the test, his compliance would in the light of his prior breach of the agreement and the publicity and out-side investigations that had since developed, constitute voluntary action on his part. Gilmour nevertheless took the test. The polygraph expert contends that as to twelve questions plaintiff's answers permit an inference that he did not tell the truth.[9]

The fact that plaintiff, after his termination, agreed to take the test did not end Roosevelt's investigation, which is still going on. Levy and three others have submitted affidavits based on statements made by plaintiff when he either intruded or joined them at a dinner party on October 24, 1975. In substance, when Levy asked him why he had originally refused to submit to the lie detector test, Gilmour responded that he wanted to protect the other men in the race and in particular mentioned Webster as a longtime friend whom he had to protect.

Upon these facts there can be no doubt that Gilmour was fairly and adequately notified of the reasons for the suspicion about the race in which he was a participant, and that the reason for the initial termination of his racing privileges was his lack of cooperation in the investigation and his failure to adhere to his agreement to take the lie detector test. He was given, not once but several times, the opportunity to present his version of the facts and the grounds for his refusal to take the lie detector test. Although he now questions the legality of the agreement that obligated him to take the test, and by implication contends that a termination based solely upon the breach of that agreement was unlawful as a matter of substantive constitutional law, the court need not pass upon this contention. As both parties have acknowledged, the situation has changed. Both Gilmour's objection to the test and Roosevelt's insistence upon it have lost importance in light of plaintiff's having taken the test and having promised to cooperate fully with Roosevelt management. More im-

---

9. In order that there may be no misunderstanding, the court states that the expert's opinion plays no part in its judgment on the motion.

portantly, for the purposes of this motion, the suspicions surrounding the race in question and the actions of the parties thereafter have prompted investigations by both federal and state officials and have generated considerable adverse publicity. The record now before the court shows that these new factors were given decisive weight in Roosevelt's decision to continue the termination; that Gilmour was apprised of this and given the opportunity, through counsel, to present his side of the case; and that a further hearing with respect to these factors, whose existence and importance can hardly be disputed, would be purposeless in any practical sense. The court therefore concludes that the procedures afforded Gilmour conformed to due process requirements and his termination is justified while Roosevelt continues its investigation in an effort to ascertain the true facts about the questioned race.

In sum, upon this record and at this stage of the action, I hold that plaintiff has not made a sufficient showing to sustain his claim for preliminary injunctive relief compelling the raceways to permit plaintiff to drive in their races while the questionable September 18 race is still the subject of proper inquiry. Upon argument, the court questioned both Roosevelt and the State Racing Board as to the prospect of completion of their respective investigations and likely future action based thereon, but received no definitive response. As the court then noted, a change in the factual setting may present the due process issue in a different context.

The motion for a preliminary injunction is denied.