**Thomas K. FORCADE et al., Plaintiffs,**

v.

**H. Stuart KNIGHT et al., Defendants.**

**Civ. A. No. 73–1258.**

United States District Court, District of Columbia.

July 7, 1976.

John H. F. Shattuck, American Civil Liberties Union Foundation, New York City,

Hope Eastman, American Civil Liberties Union, Washington, D. C., for plaintiffs.

Benjamin C. Flannagan, IV, Special Litigation Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

WILLIAM B. JONES, Chief Judge.

Plaintiffs, Thomas Forcade and Robert Sherrill, bring this action challenging the refusal of defendants to admit them to White House press briefings and conferences. In their motion for summary judgment, they argue that their First Amendment right to gather information has been abridged by the discriminatory denial of press passes without apparent standards or compelling justification. They also argue that their Fifth Amendment procedural due process rights have been violated by the failure of the Secret Service to inform them of the reasons for their exclusion, to allow them an opportunity to be heard, or to apply identifiable standards in denying their applications for press passes. They further argue that they are entitled to a *de novo* determination in this Court of the propriety of defendants' action. Plaintiffs ask the Court to declare unlawful defendants' refusal to grant them press passes and to enjoin the continuing refusal to grant accreditation to the plaintiffs.[1]

Defendants move to dismiss, arguing that the First Amendment does not give plaintiffs a right of entry into the White House and that summary procedures do not violate plaintiffs' due process rights. In the alternative, defendants contend that the Court should grant them summary judgment based upon the protective and investigative files submitted to the Court.[2]

## I. PARTIES

Thomas Forcade is a reporter in the Alternate Press Syndicate (APS) which is an international news service that represents more than 200 subscribing newspapers. According to the complaint, he has covered national political affairs since 1968, and, since 1971, has been APS's national affairs correspondent in Washington. He has been a member of the House and Senate Press Galleries since October, 1971, holds press credentials issued by the Washington D.C. police department, and was accredited as a national reporter at the 1972 Democratic and Republican National Conventions. On January 20, 1972, plaintiff Forcade covered the President's State of the Union message from the press gallery of the House of Representatives.

Since 1965, Robert Sherrill has been Washington correspondent for *The Nation.* He has been a member of the House and Senate Periodical Press Galleries since 1966. Mr. Sherrill has written more than 66 articles and numerous signed and unsigned editorials for *The Nation* and other magazines and newspapers; he has also written six books, two of which were listed on the *New York Times* list of best books of the year. It was also disclosed after this action was filed that Sherrill was on the original White House "enemies list." *See* Exhibit C to Pls' Motion for Summary Judgment.

The original defendants in this action were James J. Rowley, Director of the Secret Service, John W. Warner, Assistant to the Director of the Secret Service, George P. Shultz, Secretary of the Treasury, and Ronald L. Ziegler, Press Secretary to the President. Pursuant to Rule 25(d), F.R. C.P., H. Stuart Knight, present Director of

---

1. When plaintiffs filed their motion for summary judgment on April 15, 1974, they requested that the Court compel defendants to produce certain requested documents if their motion was denied. Eventually, on January 31, 1975, defendants produced the entire file relating to denial of plaintiffs' applications, with a small number of deletions. Defendants then requested the Court to consider *ex parte* the deleted portions in determining the pending motions.

Plaintiffs objected and moved for access to the deleted portions. On May 6, 1976, after representations by counsel that defendants would rely solely on the record made available to plaintiffs, the Court denied plaintiffs' motion for access without prejudice to its reassertion if plaintiffs be so advised. To this date, plaintiffs have not reasserted their motion for access.

2. *See* note 1, *supra.*

the Secret Service, William E. Simon, present Secretary of the Treasury, and Ronald H. Nessen, present presidential press secretary, are automatically substituted for the named defendants.

## II. FACTS

On May 28, 1971, plaintiff Forcade made written application to defendant Ziegler for a pass to attend White House press conferences and briefings. Plaintiff Forcade was informed in August 1971 that his application for a White House press pass would not be processed until he had become a member of the Senate and House Periodical Press Galleries. He received the Senate and House credentials in October 1971. It is not clear from the pleadings or the memoranda whether the receipt of these credentials was ever made known to the defendants.

After obtaining credentials for membership in the Periodical Press Galleries of the Senate and House of Representatives, plaintiff Sherrill on May 3, 1966, was denied White House press credentials by the Secret Service. He has been told that his denial is continuing in effect.

Neither plaintiff has ever received more than a minimal summary explanation for the denial of their applications. In a letter dated January 6, 1972, counsel for plaintiffs asked defendant Ziegler to explain if and why the plaintiffs had been denied press passes. Exhibit A to Complaint. In a letter dated February 11, 1972, defendant Warner, Assistant to the Director of the Secret Service, responded that plaintiff Sherrill had been denied accreditation on May 3, 1966, and that plaintiff Forcade had been denied accreditation on November 14, 1971. Exhibit B to Complaint. The only explanation given was that the passes were denied "for reasons of security." On June 26, 1972, Eugene T. Rossides, Assistant Secretary of the Treasury, in a letter to plaintiffs' counsel, referred to two incidents that impliedly influenced the decision to deny the plaintiffs' applications for press passes:

> For Mr. Sherrill's information, he has been arrested and fined for physical assault in the State of Florida. For Mr.

Forcade's information, please refer him to the New York Times, May 14, 1970, p. 8.

Exhibit F to Complaint.

After failing to obtain documents explaining the denial of the press pass applications, plaintiffs appealed, in a letter dated September 17, 1972, to Assistant Treasury Secretary Rossides to overturn the denials. Exhibit H to Complaint. On October 2, 1972, Rossides refused to reverse the previous decisions and reiterated that the press pass applications were denied "for reasons relating to the security of the President and the members of his immediate family." Exhibit I to Complaint.

Defendants agree that plaintiffs met all requirements for the issuance of press accreditation except for a security clearance. Def's Statement of Material Facts ¶ 2. They also admit that plaintiffs' applications were summarily denied, that there were no written administrative regulations in effect at the time the requests by plaintiffs for press passes were denied, and that no similar regulations are in effect now. *See* Answer, ¶¶ 12, 20.

## III. DOCUMENTS PRODUCED JANUARY 31, 1975

The FBI and Secret Service files produced by defendants (*see* note 1, *supra*) do not change the fundamental issues before the Court; however, they do provide substantial and helpful background to a determination of the issues. Deleted material, which is not included in the ensuing discussion, occurs only in the files applicable to plaintiff Forcade.

### A. *Sherrill*

The decision to deny Sherrill's application for a press pass was based upon two incidents, according to a May 3, 1966 memorandum addressed to Bill Moyers (then the presidential press secretary) from Special Agent in Charge Ronald C. Towns. The more serious incident involved an assault upon John E. Evans, press secretary to Florida Governor Ferris Bryant, on October

6, 1964. According to the various reports of the Treasury Department Intelligence Division, Sherrill assaulted Evans without provocation in the hallway of the Florida State Capitol Building. Evans speculated that the reason for the assault was a response he had written to an earlier article by Sherrill in June 1964, in which Evans had stated that the Sherrill article was substantially incorrect. According to Evans, Sherrill accused Evans of calling him a liar when he saw him in the hallway, and as the confrontation heated, Sherrill struck Evans on the jaw. Sherrill was charged with assault and battery, he pleaded *nolo contendere,* and was fined $200. The Secret Service interviewed Evans, Governor Bryant, the Tallahassee Sheriff's Department, but never, by written or oral communication, contacted Sherrill to ascertain his version of the offense.

The second incident occurred in October 1962, when Sherrill allegedly assaulted Robert Rich, principal of Fort Worth High School, at a public hearing before the Texas House Migrant Committee. The plaintiff apparently skipped bond on charges arising out of the incident, has never been prosecuted for the incident, but will be if he ever returns to the State of Texas. The information regarding this assault was provided by Evans, three newspaper articles, and a telegram addressed to Evans from the editor of a Lubbock, Texas newspaper. No other persons were contacted or interviewed to substantiate the incident, nor was plaintiff Sherrill ever requested to submit an explanation of the incident.

Finally, at least twice in the files, charges that Sherrill was "mentally unbalanced" were made, once by Governor Bryant and once in a memorandum from one "eed" to Special Agent in Charge Wong. Neither charge is substantiated by any facts, analysis, medical opinion, or explanation. Plaintiff Sherrill was never requested to comment upon the accusations.

### B. *Forcade*

Unlike Sherrill's case, the reasons for denial of Forcade's application are nowhere specifically set forth. It is therefore difficult to determine which incidents in the rather voluminous records applicable to Forcade were used as a basis to deny the application.

Forcade has been known by at least three different names during the period from 1969 to 1974, which the FBI and Secret Service files encompass. His first arrest during that period was under the name Gary Kenneth Goodson on June 19, 1969 for possession of LSD in Phoenix, Arizona. That charge was dismissed on November 10, 1969, for insufficient evidence. On November 13, 1969, Forcade again was arrested in San Diego for burglary and desecration of the American flag while attending a convention of underground press persons. Although the date is unclear, the charges were shortly thereafter dropped by the San Diego authorities. There is also an accusation that at the same convention Forcade became angered at one of the participants and hurled a glass of water at him. No charges evolved from that incident.

On May 13, 1970, at a hearing before the United States Commission on Obscenity and Pornography, when asked about his feelings about an issue, Forcade hurled a pie at Commissioner Otto N. Larson. He then read a prepared 1,000 word statement protesting the Commission's existence. No charges resulted from the incident.

During the demonstrations in Washington, D.C. in the summer of 1971, Forcade publicly stated that he planned to hold a "massive marijuana smoke-in" at the Washington Monument on July 4, 1971. No action was taken against Forcade for the statements and it does not appear in the record whether the "smoke-in" ever occurred.

The majority of the records produced concern Forcade's relationship with and activities in the Youth International Party (popularly known as the Yippies), the spin-off Zeitgeist International Party (popularly known as the Zippies), the Students for a Democratic Society (SDS), and the May Day Committee. It appears from the record that Forcade was an active member

and leader within the Yippie movement until May 26, 1972 when he was expelled by a committee of the membership. Until that time, the records state that he had advocated the use of violence at the Democratic National Convention in Miami in 1972, and that he had stated on more than one occasion that the United States Capitol Building is "wide open for another bombing" similar to the celebrated restroom bombing that had earlier occurred. At the time of his expulsion from the Yippies, it was reported by an informant that he acted like "a wild man" and allegedly "carved up" a wall with scissors during the May 26 meeting. On May 30, 1972, Forcade and his followers attempted to physically penetrate the Yippie office in Miami, but were repulsed by a "wedge" formed by Abbe Hoffman and his followers. The FBI reports also list several other instances during this summer period arising out of the Yippie/Zippie split which can only be characterized as pranks.

Three other criminal violations were allegedly committed by Forcade during the remainder of 1972. On August 23, 1972, Forcade was arrested after a van which he was driving was stopped by police. There were approximately 14 other persons in the van at the time, and the police found a five-gallon can of gasoline along with wax-and-wick devices which allegedly were incendiary devices for the gasoline can. On February 8, 1973, Forcade was indicted for violations of the National Firearms Act, 26 U.S.C. §§ 5861(c), 5871, arising out of the August 23, 1972 arrest. On March 29, 1973, the charges were dismissed by Judge Fay of the United States District Court for the Southern District of Florida after a two day trial for insufficient evidence. Second, on October 25, 1972, charges brought against Forcade for allegedly burglarizing a ten-foot high portrait of President Johnson were dismissed for failure of the complaining witness, the Democratic National Committee, to respond to a subpoena. Third, on October 12, 1972, Forcade was arrested in New York City for criminal trespass and harassment under the alias of Dennis Stuckey. The record does not show the disposition of those charges. It should be

noted that the final decision of the Secret Service to deny Forcade's application preceded most of the reports concerning the National Firearms Act charge, as well as the criminal trespass charge.

The most serious allegation, which was unintentionally disclosed by defendants when the files were produced pursuant to the Court's January, 1975 Order, is contained in one of the FBI profiles of Forcade. That profile, dated January 24, 1972, under the heading "Education and Training," states:

> This category is not known at this time. It is noted that the subject has allegedly stated that he intends to place a gun within a camera and gain access to the White House with the intentions of shooting the President.

Finally, throughout Forcade's file the following warning appears several times:

> ALL INDIVIDUALS INVOLVED IN NEW LEFT EXTREMIST ACTIVITY SHOULD BE CONSIDERED DANGEROUS BECAUSE OF THEIR KNOWN ADVOCACY AND USE OF EXPLOSIVES, REPORTED ACQUISITION OF FIREARMS AND INCENDIARY DEVICES AND KNOWN PROPENSITY FOR VIOLENCE.

Nowhere in the file is there evidence that Forcade was requested to respond to any of the charges, or to explain his version of the events alleged. Nor is there any explanation of the events which the Secret Service considered sufficiently serious to warrant denial of plaintiff's application.

#### C. *Wong Memorandum*

Also included in the file relating to Forcade is a memorandum from Special Agent in Charge Wong (Technical Security Division) to "AD Kelley" (Protective Intelligence), entitled "Criteria for Denial of Entry—White House." The memorandum states that "pre-entry investigations" are to be made "to determine whether the admission is clearly consistent with the interests of national security." It also outlines "some of the criteria" for barring entry to the White House:

Criminal, infamous, dishonest, immoral, notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction, sexual perversion, mental instability, propensity for violence as shown by previous conduct, commission of any act of sabotage, espionage, treason, sedition, or attempts; preparation or conspiring with, or aiding and abetting, another to commit or attempt to commit any act of sabotage, espionage, treason or sedition.

Establishing or continuing a sympathetic association with a saboteur, spy, traitor, seditionist, anarchist, or revolutionist.

Advocacy of use of force or violence to overthrow the Government of the United States, or of the alteration of the form of government of the U.S. by unconstitutional means.

Intentional, unauthorized disclosure to any person of security information, or of other information disclosure of which is prohibited by law, or willful violation or disregard of security regulations.

There is nothing in the files, or in the record in this case, which discloses that these criteria were ever made public, made available to other members of the Secret Service, or made available to either of plaintiffs prior to or subsequent to denial of their press pass applications.

## IV. FIRST AMENDMENT CLAIM

Defendants, citing *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), argue that no First Amendment right is involved here. In *Zemel*, a United States citizen whose passport application for travel to Cuba had been denied, argued that the denial abridged his First Amendment right to gather information. The Court rejected the argument, stating:

We must agree that the Secretary's refusal to validate passports for Cuba ren-

ders less than wholly free the flow of information concerning that country. While we further agree that this is a factor to be considered in determining whether appellant has been denied due process of law, we cannot accept the contention of appellant that it is a First Amendment right which is involved. For to the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not), it is an inhibition of action. There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.

381 U.S. at 16–17, 85 S.Ct. at 1280. Defendants would apply this language to the instant case and argue that because their actions have inhibited the plaintiffs' *action* (in entering the White House) rather than their *speech,* no First Amendment right is involved.

■ To apply *Zemel* to the instant case in the manner contemplated by defendants would require an unfounded and overbroad interpretation of *Zemel* as well as a repudiation of subsequent case law. *Zemel* did not address or consider the problem of restrictions on the newsgathering ability of a member of the press. While it is true that a newsman has no constitutional right of access "beyond that afforded the general public," *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974), it has been recognized that "news gathering is not without its First Amendment protections." *Branzburg v. Hayes,* 408 U.S. 665, 707, 92 S.Ct. 2646, 2670, 33 L.Ed.2d 626 (1972). Newsgathering itself is "action" rather than "speech," but restriction of newsgathering necessarily restricts the freedom of the press to print the news.[3]

---

**3.** In *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Court held that the First Amendment was applicable to the government's decision to bar a nonresident alien academic from entering the country "to participate with [American citizens] in colloquia debates, and discussion in the United States." 408 U.S. at 764, 92 S.Ct. at 2582. The Court distinguished *Zemel* by stating that

where the attempted restriction, although facially applicable to the "action" of the nonresident alien (who was without first amendment protection), in effect infringed upon the "right to receive information" of the American citizens, the First Amendment applies to the government decision. 408 U.S. at 764–65, 92 S.Ct. 2576.

After *Branzburg* and *Pell*, it cannot legitimately be argued that newsgathering is unprotected by the First Amendment, and other courts have so held. *See Borreca v. Fasi*, 369 F.Supp. 906, 908–09 (D.Haw.1974); *Lewis v. Baxley*, 368 F.Supp. 768, 777 (M.D. Ala.1973) (three judge court).

It next must be determined whether defendants' actions violated plaintiffs' First Amendment rights. Before analyzing the applicable case law, it is important to note precisely what is at issue. Plaintiffs do not contend that reasonable restrictions cannot be placed on press access to the White House. Because the only articulated governmental interest at issue here is the safety of the President, there is no argument that restrictions based upon that interest cannot be imposed. Plaintiffs do contend, and this is the heart of their case, that restrictions based upon the need for presidential safety must be imposed in a nondiscriminatory manner and pursuant to specific, narrowly defined guidelines. With that in mind, the cases dealing with plaintiffs' contention will now be addressed.

In *Consumers Union of U. S., Inc. v. Periodical Correspondents' Association*, 365 F.Supp. 18 (D.D.C.1973) *rev'd on other grounds*, 169 U.S.App.D.C. 370, 515 F.2d 1341 (1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976), Judge Gesell considered the constitutionality of the denial of a press pass application made by Consumers Union for access to the Senate and House Periodical Press Galleries. The major portion of Consumers Union's revenue is derived from its publication "Consumer Reports" and it was for this periodical that Consumers Union sought access to the Galleries for its reporters. The stated reason for the denial was Consumers Union's failure to meet the requirements of Rule 2 of the Rules Governing Periodical

Press Galleries, which states that access must be denied to a publication which is not "owned and operated independently of any industry, business, association, or institution." 365 F.Supp. at 22. After determining that the case presented a justiciable controversy (a determination that the Court of Appeals later reversed), Judge Gesell upheld plaintiff's claim that the denial violated its First Amendment right to freedom of the press and its Fifth Amendment right to due process and equal protection of the law. Recognizing that "reporters do not have an unrestricted right to go where they please in search of news," Judge Gesell nonetheless stated:

> [T]he elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied by congressional action or publishers meeting under congressional auspices, constitutes a direct limitation upon the content of [the] news.

365 F.Supp. at 25–26. The court concluded:

> Exclusion of a publication from the galleries can only be sanctioned under carefully drawn definite rules developed by Congress and specifically required to protect its absolute right of speech and debate or other compelling legislative interest. [cites omitted] Such rules must, among other things, be so fashioned that due process is provided prior to exclusion, with opportunity for adequate impartial review wherever a publication is excluded. [cite omitted]

365 F.Supp. at 26–27.[4]

■ In *Quad-City Community News Service, Inc. v. Jebens*, 334 F.Supp. 8 (S.D. Iowa 1971), the police department in Davenport, Iowa, had denied press passes and

---

4. The Court of Appeals, although not reaching the merits, intimated its disagreement with the application of these principles to the facts of the case. Specifically, it noted that the rule challenged did not disadvantage plaintiff relative to the public or press generally and that the distinctions established by the rule were applied equally. *See* 515 F.2d at 1346–47. It did not comment upon the problem of vagueness, which seemed to be the principal rationale for Judge Gesell's opinion, as the language quoted above indicates, and which is at the heart of the instant case.

access to police records, otherwise available to the press, to the reporters for "Challenge," an underground newspaper. At trial, the reasons given in support of the denial were that the newspaper was not a "legitimate" or "established" newspaper, and further, that certain of the paper's reporters has been convicted of felonies. 334 F.Supp. at 12. There was no written policy defining "legitimate' or "established" press, nor were there any written or published standards or guidelines for issuance of press passes. *Id.* Moreover, the record showed that prior to the litigation, the defendants had refused to give plaintiff any reason for denial of the press pass application, or to inform plaintiff how it could qualify for a pass. 334 F.Supp. at 16. The court found the discriminatory treatment violative of the First and Fourteenth Amendments because no compelling state interest was shown. Further, and more importantly for the purposes of the instant case, the court found the vagueness or nonexistence of any written standards or regulations governing issuance of press passes violated the plaintiff's First Amendment right to freedom of the press and its Fourteenth Amendment right to procedural due process. The court pointed out that plaintiff, as here, did not contend that the press has an unrestricted right of access to all records or public events, but instead argued that the decision to restrict could not be made in a discriminatory manner. In language directly applicable to the instant case, the court stated:

It must be apparent that where public officials, in making decisions such as here involved, use [or] employ criteria or reasons that are either vague or completely unknown, the party affected has no way of knowing how to achieve compliance with the criteria nor even of challenging them as being improper. In such situations, the public officials literally have unimpeded discretion to regulate the activity in question in whatever manner they desire.

Regulation in the area of free expression can only be tolerated when a public offi-

cial's discretion is guided by narrow and specific standards which advance a compelling state interest. [cites omitted]

334 F.Supp. at 17.

The *Quaker Action* litigation, involving four cases before the court of appeals for this circuit, affords further substantial guidance to resolution of the issues in the instant case, not only because it treats with First Amendment expression, but also because it analyzes and balances the governmental interest in the physical safety of the President. The *Quaker Action* litigation, originally commenced in 1969, involved the constitutionality of certain policies, and later regulations, instituted and enforced by the Department of the Interior concerning the issuance of permits for, and the size of, demonstrations near the White House. The policies/regulations required that a permit be obtained for gatherings at Lafayette Park and on the White House sidewalk, and also barred any demonstrations that would exceed 100 persons on the sidewalk or 500 persons in the Park. Several groups wishing to demonstrate in May 1969 were refused permits because they exceeded the size limitations. Judge Bryant issued a preliminary injunction, which was immediately appealed.

In *Quaker Action I,*[5] the court of appeals affirmed the preliminary injunction, but modified it to require prior notice of a demonstration so that the Interior Department could seek a court order enjoining a particular demonstration. The modification was necessitated "[b]ecause of the peculiar sensitivity of one issue involved—the safety of the President," which of course is central to the case before this Court as well. 421 F.2d at 1113. Addressing the "paramount interest" of the state in the safety of the President, the court made the following comments:

[T]he Government has injected an additional, and most important, element into the case by arguing that large demonstrations threaten the safety of the President. This, of course, is a paramount interest underscored in importance by the

---

5. *A Quaker Action Group v. Hickel,* 137 U.S. App.D.C. 176, 421 F.2d 1111 (1969).

tragic assassinations in recent years. But we cannot agree with the Government's argument that mere mention of the President's safety must be allowed to trump any First Amendment issue. While courts must listen with utmost respect to the conclusions of those entrusted with responsibility for safeguarding the President, we must also assure ourselves that those conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat.

The Government suggests that the importance and delicacy of any decision affecting the President's safety requires this court to limit its review to a determination whether the decision was "wholly rational." We do not agree. . . . [A]bsent a compelling showing—which has not been begun here—that courts cannot evaluate the questions of fact involved in estimating danger to the President, the final judgment must rest with the courts.

421 F.2d at 1117–18.

In *Quaker Action II*,[6] the court of appeals reversed Judge Hart's grant of summary judgment to the government in order that an evidentiary hearing be held to more fully develop the issues. The court was particularly concerned with allegations of discriminatory administration of the permit system, found by Judge Bryant to be supported by the evidence when he issued the preliminary injunction, but not addressed by Judge Hart in his judgment for the government. According to the court of appeals, "[t]he authority to prohibit picketing does not establish as a corollary the authority to establish unreasonable rules for determining which picketing will be permitted and which denied." 429 F.2d at 187. Further, the court was concerned with the factually untested assertions of the government that the 100/500 limitations were reasonable, especially in light of the fact that

they were established, "not in a regulation or even public notice, but in an internal memorandum to subordinate officials administering the permit system." *Id.*

In *Quaker Action III*,[7] the court again reversed a grant of summary judgment to defendants. Although Judge Hart initially had been disposed to conduct an evidentiary hearing as directed by the remand in *Quaker Action II*, the government argued that because the Secretary of the Interior had in the interim issued regulations—superseding the simple policy directive included in the intra-agency memorandum—the court's review was now limited to a determination of the existence of substantial evidence to support the regulations. Judge Hart agreed, and granted summary judgment for the government. The court of appeals reversed. In doing so, it reiterated that "incidental restriction on alleged First Amendment freedoms," resulting from attempted furtherance of a governmental interest, can be "no greater than is essential to the furtherance of that [governmental] interest." 460 F.2d at 860. The Court further stated:

> Of course the health and safety of the President are of concern to the citizenry. But this only poses, it does not answer, the question as to whether the officials involved have transformed this concern into an excessive preoccupation with security that is achieved at the unnecessary expense of First Amendment freedoms.

*Id.* Accordingly, the case was remanded for a trial on the merits regarding, among other things, "[t]he issues concerning the scope of the regulations and the need for their extent and restrictiveness." *Id.*

Finally, in *Quaker Action IV*,[8] the court of appeals resolved the case on its merits. Essentially, it upheld the judgment of the district court, although modifying it in certain respects. In doing so, the court set out the standards by which cases similar to the case before this Court must be

---

6. *A Quaker Action Group v. Hickel*, 139 U.S. App.D.C. 1, 429 F.2d 185 (1970).

7. *A Quaker Action Group v. Morton*, 148 U.S. App.D.C. 346, 460 F.2d 854 (1971).

8. *A Quaker Action Group v. Morton*, 170 U.S. App.D.C. 124, 516 F.2d 717 (1975).

judged. First, the court must find that the government "balance[d] the First Amendment rights against the other legitimate interests to arrive at a reconciliation that is both constitutional and an acceptable accommodation of all the factors." Second, the scheme constructed by the government must not "risk abuse of First Amendment rights through a broad censorship power or other improper application of theoretically acceptable restraints." 516 F.2d at 725. The restriction on expression must further an important or substantial governmental interest, the governmental interest must be unrelated to the suppression of free expression, and the incidental restriction on alleged First Amendment rights must be no greater than is essential to the furtherance of that interest. 516 F.2d at 725–26.

Particularly applicable to the instant case is the challenge by plaintiffs in *Quaker Action IV* to a regulation authorizing rejection of demonstration permits if "[i]t reasonably appears that the proposed gathering will present a clear and present danger to the public safety, good order, or health . . . ." The court of appeals found this regulation *not* to be vague or overbroad:

> Given the uniqueness and importance of the security interest of protection of the White House as justifying a greater limitation than would be applicable generally to use of public streets and parks, we conclude that the Constitution is not offended by the standard in the regulation, limited as it is (1) to the presence of a clear and present danger, that is (2) confined to the need to protect public safety and public health (including in public safety the avoidance of disorder).

> .   .   .   .   .

> The regulations before us do not extend to categories as amorphous as welfare, decency and convenience. And they do not define the granting of the permit in terms of the subjective judgment of the officials. The regulations before us are

defined in terms of substantive criteria and the courts are open in the event of maladministration to hear the concrete evidence in support of such a complaint. 516 F.2d at 729.

The case presently before the Court is a prime example of the improper governmental action that *Consumers Union, Quad-City Community News,* and the *Quaker Action* litigation attempt to foreclose. To be sure, the interest asserted here by the government—protection of the physical safety of the President—is a compelling, if not "paramount" interest.[9] Furtherance of that interest, however, when it conflicts with valid First Amendment rights, must be achieved through standards narrowly and specifically drawn to ensure that the subjective judgment of the officials does not result in unnecessary restriction, or abusive censorship, based upon an applicant's political tenets rather than the danger he poses to the President's physical safety. The only set of standards which have been made public are those contained in a memorandum from a special agent in charge to another Secret Service official. *See* page 1032 *supra.* Those standards are extremely broad and vague, and it is questionable whether they would withstand constitutional scrutiny. Even if they could, however, there is no indication that they have been approved by the head of the agency, that they are uniformly followed, or that they are even known to other members of the agency. Moreover, it is clear that those standards were not made known to the plaintiffs or to any other person who might wish to obtain a White House press pass. In the absence of such a showing, the only "standard" advanced by the defendants which this Court could adjudge is "reasons of security." Accepting the fact that protection of the President permits "a greater limitation than would be applicable generally" to First Amendment expression, *Quaker Action IV, supra* at 729, the "reasons of security" standard advanced by de-

9. "The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive   .   .   ." *Watts v. Unit-* *ed States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).

fendants could not be broader, more vaguely worded, or pregnant with the possibility of agency abuse. As in *Quad-City Community News, supra,* it affords agency officials practically "unimpeded discretion to regulate the activity in question in whatever manner they desire." 334 F.Supp. at 17.[10]

Defendants would have the court uphold their action in denying plaintiffs' applications based upon the record as it has been disclosed to plaintiffs. *See* note 1, *supra.* If this were the appropriate task at this point, there would be ample justification for reversing the decision with regard to plaintiff Sherrill, particularly in light of the two relatively minor incidents relied upon by defendants, one of which is unsupported by any direct evidence of its nature or occurrence. Although there is more substantial evidence which might form a sufficient basis for the denial of plaintiff Forcade's application, much of the evidence is hearsay, none of it has been subjected to even the most rudimentary cross-examination, and in the absence of any standards, it is impossible for this Court to make a reasoned decision about the danger to presidential security posed by the actions of plaintiff Forcade.

■ Under *Quaker Action I, supra,* this Court must undertake a *de novo* review in determining the propriety of the agency action. To do so at this time, however, would be inappropriate. In order to undertake a proper *de novo* review, fully recognizing that "courts must listen with the utmost respect to the conclusions of those entrusted with responsibility for safeguard-

ing the President," *Quaker Action I, supra* at 1117, it is necessary first that the Secret Service—which in the first instance possesses the requisite expertise in presidential security—articulate in as precise terms as possible the standards for issuance and denial of White House press passes. *See Women Strike for Peace v. Morton,* 137 U.S.App.D.C. 29, 420 F.2d 597, 603 (1969). Second, it is incumbent that a written decision by the defendants issue which applies the standards to the facts of each plaintiff's case, denotes the particular events or considerations supporting its decisions, and fully states the reasons why those events or considerations necessitate denial of the application. Only upon completion of this process would the Court be sufficiently informed to render its *de novo* determination.[11]

The main thrust of defendants' argument is that summary decisions regarding press pass applications are not only proper but necessary because "[t]he matter is not subject to a formalistic determination and must be made on the basis of the special expertise gained by the Secret Service since 1902." Def. Mem. at 23. This, of course, overlooks the fact that the defendants have, at least internally, attempted to get general standards for ingress and egress to the White House. *See* Wong Memorandum, p. 1032 *supra.* Moreover, such a statement is made in the absence of any proffered standards at all. There has been no attempt to publicly establish standards of any degree of specificity with a concomitant explanation of the defendants' inability to further narrow or specify them. Without even an

---

**10.** This is not to say that the defendants have in fact abused their self-award discretion in the instant case. There are no facts in the record which would intimate that the reasons underlying the denial of plaintiffs' applications were other than danger to the physical security of the President.

**11.** Remanding to the agency for further proceedings would, of course, result in substantial delay to both plaintiffs. It may be that upon review of either or both applications, defendants may reverse their earlier decisions. Moreover, a time limit can be placed upon the agen-

cy, for example, 120 days. In the absence of any quick reversal, however, the interest in the physical safety of the President mandates that the Court proceed with the utmost caution. As the Court of Appeals noted in *Quaker Action I*:

> In a suit involving private parties, we might well find that such a failure of proof entitled the appellant [Government] to the consequences. But the safety of the President cannot be endangered merely because the Government has wholly failed to support its arguments.

421 F.2d at 1118.

attempt, it is difficult to accept the broad assertion of defendants in good faith.[12]

## V. FIFTH AMENDMENT

It only remains to determine the nature of the proceeding before the agency. In doing so, the two different theories of plaintiffs' complaint become somewhat merged. To this point, the discussion has centered upon the strictures of the First Amendment and their applicability to the instant case. The conclusion has been that defendants have not proceeded within these strictures, but that before any relief is granted plaintiffs individually, the agency must undertake certain actions to define the applicable standards, to apply those standards to the plaintiffs' cases, and to render written decisions in each case. Articulation and publication of applicable standards are required by the First Amendment to insure that a government official does not have unbridled discretion in passing upon plaintiffs' applications; the application of the standard to the facts of this case, in a written decision, is necessary under the First Amendment to enable this Court adequately to discharge its duty of reviewing the agency decision *de novo*. Whether plaintiffs have a right to confront and cross-examine witnesses, to be informed of the evidence against them, and to rebut that evidence, is a question not answerable under the First Amendment. If plaintiffs possess such rights, it is the Due Process Clause of the Fifth Amendment which affords them.

■ Defendants' first contention is that the Due Process Clause does not apply to the instant case because plaintiffs have not been deprived totally of any opportunity for employment, but have only been barred from exercising their chosen profession in

one arena, the White House. Plaintiffs respond that a partial but substantial impairment of their ability to carry out their employment constitutes a deprivation of due process requiring application of the Due Process Clause. The requirements of the procedural due process apply "to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). And it is clear that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' " concept of the Due Process Clause. *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); *Shaw v. Hospital Authority of Cobb County*, 507 F.2d 625, 628 (5th Cir. 1975); *Gilmour v. New York State Racing & Wagering Bd.*, 405 F.Supp. 458, 459–60 (S.D.N.Y.1975). It is immaterial whether the governmental interference amounts to a total preclusion from a chosen profession or only a partial interference with the free exercise of that profession. *See Shaw, supra* (denial of podiatrist application for staff membership at one of several hospitals); *Gilmour, supra* (denial of application to participate in harness races in New York). Here, plaintiffs have introduced uncontradicted affidavits that the denial of their press pass applications has been an "increasing impediment" to their professional work, by "greatly restricting" news sources in Washington, D. C. *See* Sherrill, Forcade Affidavits. Plaintiffs are entitled to procedural due process. *See Greene, supra; Shaw, supra; Gilmour, supra*.

The next question is what process is due. "[C]onsideration of what procedures due process may require under any given set of

12. Although it is unnecessary to reach defendants' argument that summary control over access to the White House is permitted and authorized by statute, resolution of the argument would be adverse to defendants' position. There is nothing in either 3 U.S.C. § 202 or 18 U.S.C. § 3056, relied upon by defendants, that even implies that the authority of the Secret Service is unchecked by any procedural requirements, or that Congress intended that the Secret Service carry out its authorized duty without regard to First or Fifth Amendment rights. In the absence of explicit statutory authorization to preempt traditional constitutional guarantees, defendants' statutory argument must fall. *See Greene v. McElroy*, 360 U.S. 474, 496, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). The government function involved here, protection of the physical security of the President, is of "paramount" importance. *See Quaker Action I, supra.* The government has a further interest in maintaining the confidentiality of its sources who provide it with information necessary to determine the danger that a particular individual might pose to the physical safety of the President. On the other hand, the particular plaintiffs now before the Court, and perhaps more importantly, the public at large, have an interest in nondiscriminatory access to White House press conferences and other privileges afforded the holder of a press pass. This interest is, of course, quite substantial, finding its roots in the First Amendment's guarantee of freedom of the press.

The conflict between these interests would arise only if the government in its decision to deny an application chose to rely in whole or in part upon information determined to be nondisclosable because coming from a confidential informant. Although the informant's privilege may preclude production of certain evidence or documents to a White House press pass applicant, the question remains whether the agency, in the context of this case, may base its denial of a press pass application on evidence, the nature or source of which is not disclosed to the applicant.

At this point, it is incumbent to remember that the private interest involved in this action is not merely that of an individual seeking to gather information. If that were the only interest, it might very well be

that, considering the necessity for the ongoing protection of the President, the agency would not need to disclose the source of its evidence against the applicant. It is not merely the interest of one individual in seeking to gather information which is at stake, however, for denial of White House access to differing viewpoints of the press deprives the public of the uninhibited, robust debate which is at the heart of the First Amendment.[13]

The substantial and fundamental importance of the private interest involved here only serves to underscore the need for application of the "relatively immutable" principle of our jurisprudence recognized in *Greene v. McElroy, supra* :

> [W]here the governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

360 U.S. at 496–97, 79 S.Ct. at 1413. The Court of Appeals has applied this principle in a case similar to the one at bar. In *States Marine Lines, Inc. v. Federal Maritime Comm'n*, 126 U.S.App.D.C. 187, 376 F.2d 230 (1967), the court had to determine the procedural fairness of the self-policing system of the shipping industry. After determining that the industry was sufficiently infused with monopolistic tendencies, governmental regulation, and the public interest to require application of procedural due process, the court analyzed the various deficiencies in the self-policing system. Of prime concern to the court was the prohibition of disclosure to the shipping firm accused of improper practices of the name of the complainant or of any information considered by the factfinder which would tend to disclose the identity of the complainant. The court found that the system did not prohibit a factfinder "from basing its deci-

---

**13.** As Judge Learned Hand has stated, the First Amendment

presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authorita-

tive selection. To many this is, and always will be, folly; but we have staked upon it our all.

*United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

sion on evidence the accused has no chance to confront in original form." 376 F.2d at 240. *States Marine's* contention that the self-policing system conflicted with the principle of *Greene v. McElroy* was, according to the court, "well founded." *Id.* It ordered the case remanded to the Federal Maritime Commission for development of a new self-policing system that "provide[s] reasonable assurance that a member will be penalized only on the basis of evidence it has an adequate opportunity to rebut or explain—in other words, that the accused will in fact be treated fairly." 376 F.2d at 242.

This is not to say that the Secret Service would be required to disclose the identity of a confidential informant, either directly or through disclosure of information tending to reveal the informant's identity. But if the Secret Service chooses to base its decision to deny a press pass application upon evidence which has been obtained from a confidential source, it must provide the applicant with an "adequate opportunity to rebut or explain" that evidence. Whether this would require disclosure of the informant's identity can only be determined within the context of a particular case.[14] If it determines not to reveal the source's identity, and if such action would preclude an "adequate opportunity to rebut or explain," then the agency cannot base its decision on the evidence provided it by the source.

▮▮▮▮ The Court need not further specify the scope of the procedures. It is sufficient to hold here that the Secret Service, within a reasonable period of time[15] after application for a press pass, must render a decision based upon narrow, specifically defined, and publicized standards. If the decision is to be adverse to the applicant, he must, prior to the final decision, be informed of the evidence against him, the standards which the evidence contravenes, and the grounds for the contemplated denial, and further, he must be afforded an opportunity to rebut or explain the evidence or grounds upon which the contemplated denial is based. If after an "adequate opportunity to rebut or explain," the decision is still adverse to the applicant, then the Secret Service must issue a written decision specifying the grounds and outlining the evidence for the decision. The nature of the "opportunity to rebut or explain" need not be determined in any greater detail at this time. Whether the rebuttal need be oral or in writing will depend upon the facts of each case, depending upon, among other things, the importance of the issue of credibility and the nature of the offense which is the basis for the agency's decision. Not being immediately familiar with the entire range of issues or evidence which comes before the Secret Service, this Court should initially defer to the defendants to afford them an opportunity to determine and devise rules within which decisions to issue press applications should be made.

## VI. CONCLUSION

From the foregoing the Court holds: (1) that defendants' failure to devise, publicize, and utilize narrow and specific standards for the issuance or denial of press passes infringes on plaintiffs' First Amendment right to freedom of the press; (2) that defendants' failure to inform plaintiffs of the evidence or grounds of the decision to deny their press pass applications, or to permit them an adequate opportunity to rebut or explain the evidence or grounds, violates their Fifth Amendment right to procedural due process; (3) that the case be remanded to the Secret Service to devise and publicize narrow and specific standards

---

14. For example, in *Forcade's* case, it might not be necessary to reveal the identity of a confidential source within the camp of Forcade's followers, if the evidence related to the Secret Service was of a public nature—such as the glass throwing incident at the San Diego convention in 1969—and could be rebutted without the need for cross-examination of the source.

On the other hand, where the source was the only witness to an alleged statement or act of Forcade's, the need to cross-examine the source might require disclosure of his identity.

15. It is contemplated that the standards to be promulgated will include time limitations.

for the issuance or denial of press pass applications, to consider plaintiffs' applications within the context of the newly devised standards, and to render a written decision specifying the grounds for denial, if that be the decision, after affording plaintiffs an adequate opportunity to rebut or explain any evidence or grounds upon which the agency bases its denial. An appropriate order is being entered simultaneously with this Memorandum.